## Graham *vs* Strader & Gorman, and Strader & Gorman *vs* Graham.

ERROR TO THE LOUISVILLE CHANCERY COURT.

*Slaves, removal of. Steamboats, owners and masters.*

JUDGE MARSHALL. delivered the opinion of the Court.

GRAHAM filed his bill in the Louisville Chancery Court, attaching the steamboat Pike, and making the owners, Strader & Gorman parties, under the acts of 1824 and 1828, to recover damages for the unauthorized transportation of his three slaves, Reuben, Henry, and George, on board said steamboat from Louisville to Cincinnati, whence they escaped to Canada. The slaves are described as three yellow men between nineteen and twenty three years of age, well trained as dining room servants and as scientific musicians, in which capacity they had been in the habit, for some years, of playing together on various instruments, at balls and parties, and during the watering season were retained by the complainant at the house kept by him at the Harrodsburg Springs, to play for the entertainment of his company. The bill alledges and several witnesses state, that each of them were worth $1500. The evidence conduces to prove that they were taken on board the Pike at Louisville, about the last of January, 1841, when they had with them, besides their clothes, musical instruments and books of the value of about $250; that from Cincinnati, to which place they were transported in the boat, they escaped to Canada, and that the complainant had expended from $700 to $1000 in fruitless efforts to recover them.

The defendants, in their original answer, besides denying the allegations of the bill, "charge that the said slaves

are musicians, and have been, (since a long time previous to their alledged escape,) allowed by the complainant to travel about as free negroes, and to play at parties, public and private, and to receive their wages earned by them: and that they have frequently been allowed to go out of the Commonwealth as if they were free." In an amended or additional answer, subsequently filed, they charge that the complainant allowed the slaves to go to Louisville to live with Williams, a free man of color, to learn music, and afterwards gave them written permission to go to the State of Ohio, that they did go and remained there a long time, and were sent there by complainant's direction, to perform service as slaves, and that in consequence thereof, they acquired a right to freedom, and are free, and were so when the bill was filed and long before.

The defendants seem to have filed an exhibit, though it is not referred to as such in any of their pleadings, a paper which is proved to have been signed by Graham, the complainant, and is of the following tenor: "Harrodsburg, August 30, 1837. This is to give liberty to my boys, Henry and Reuben, to go to Louisville with Williams, and to play with him till I may wish to call them home. Should Williams find it his interest to take them to Cincinnati, New Albany, or to any part of the South, even so far as New Orleans, he is at liberty to do so. I receive no compensation for their services except that he is to board and clothe them—My object is to have them well trained in music. They are young, one 17 and the other 19 years of age. They are both of good disposition and strictly honest, and such is my confidence in them that I have no fear that they will ever act knowingly wrong, or put me to trouble. They are slaves for life, and I paid for them an unusual sum; they have been faithful hardworking servants, and I have no fear but that they will always be true to their duty, no matter in what situation they may be placed.        C. GRAHAM, M. D.

"P. S. Should they not attend properly to their music or disobey Williams, he is not only at liberty, but requested to bring them directly home.        C. GRAHAM."

Proof in the
cause and decree
of the Chancellor.

It appears that the boys, Henry and Reuben, while under the care of Williams, were with him once in Cin-

cinnati, Ohio, once and perhaps twice in Madison, Indiana, and two or three times in New Albany, Indiana, playing as musicians, at balls or other entertainments at those places. One witness states that George was with them in May, 1837, when they were at Cincinnati and Madison; but it is denied by the witness, Graham, that George was ever placed with Williams by his master; and there is no proof, unless in the fact stated by the other witness referred to, that his master had ever permitted him to go out of the State, or that he had ever been out of the State prior to the time of his escape with the others. It was proved that none of them had been under the care of Williams, or living with him, for about two years prior to their escape, but that except during the watering season, when they were required to be at home, they were stationed at Lexington as their head quarters, with liberty to go to the neighboring towns to play as musicians, and to give their master what they made beyond their expenses, and that they did thus go about to the neighboring towns. This privilege is variously stated by different witnesses, from the conversations of the complainant, one stating that Dr. Graham had said he had allowed them to go where they pleased; others that he had restricted them to the towns immediately around Lexington, and had prohibited them from going to the towns on the Ohio river. And two witnesses, residents one of Lexington and the other of Frankfort, say they had been requested by the complainant, who went to New Orleans in the winter of 1840–41, to have some supervision over these slaves. It was stated by the witness, Graham, that it would cost $500 to supply their place as musicians at the Harrodsburg Springs, for a single season. Upon the hearing, the Chancellor being of opinion that the writing of the 30th August, 1837, above set out, was a sufficient license and permission, without limit as to time, to authorize any steamboat to take the slaves Henry and Reuben on board, and land them at any place, in or out of the State, dismissed the complainant's bill and claim of damages for the exportation of those two slaves; and as to the slave George, directed a jury to be empanneled as required by the 9th section of the act of 1839, (3 *Stat.*

*Law*, 16,) to ascertain such facts as should be submitted them. On this enquiry, the pleadings, depositions and exhibits, were read to the jury, and numerous instructions having been asked for by the parties, and given or refused by the Chancellor, a verdict was found for the complainant, of $1000 in damages. The motion of each party for a new trial was overruled. And a decree having been rendered in conformity with the verdict, each party seeks its reversal in this Court. Without detailing the various opinions to which the parties respectively objected, we shall proceed to notice the several questions involved in those objections, as relied on in this Court.

I. And first, it is urged on the part of the complainant, that the Chancellor erred in dismissing the bill as to Henry and Reuben, on the ground of the writing above referred to.

The provisions of the statutes of 1824 and 1828, making owners, masters, &c. of steamboats liable for taking slaves out of the State, without authority from their masters, &c.

The acts of 1824 and 1828, (*Stat. Laws*, 259–60,) by their joint effect, make the owners, master, &c., and the boat liable, for taking out of the limits of this State, any slave, who has not in his possession, a record of some Court of the United States, properly exemplified, proving his right to freedom, unless the owner or master, &c. of the boat shall have the permission of the master of the slave for such removal; and not only is the offending party made liable in damages to the party aggrieved by such removal, but also, to indictment, and fine and imprisonment, at the discretion of a jury, and the boat itself is made liable to the party aggrieved, to be proceeded against by suit in Chancery, and condemned and sold to pay the damages.

Now, it seems to us, that unless these statutes, and the protection which they intended to give to the owners of slaves in Kentucky, are to be frittered away by construction, and rendered wholly delusive, the liability which they impose, cannot, in the absence of record evidence of the freedom of the slave removed from the State in a steamboat, be avoided or evaded, except by showing the express or implied permission of the owner of the slave, that he may be so removed at the time. Indeed, the words of the statute seem to require that some person connected with the boat should actually have the permis-

sion when the act is done.   And it is only under a liber-
al construction of the statute, not improper perhaps in a
case of a private claim for damages, that the liability can
be absolutely avoided, even by subsequent proof of a
general permission given to the slave himself, and not
exhibited, nor proved to the officers of the boat, nor to be
inferred from facts previously known to them.

They must have the permission of the master of the
slave for any removal of the slave by their boat, from
Kentucky to another State; or they will be liable for the
damages consequent thereon.   It surely cannot be suffi-
cient for the owners or others connected with the boat in
which a slave has been thus removed, without any direct
license from his master, but merely by his own desire to
show that the owner of the slave had repeatedly taken him
with him between the same points, or that he has allow-
ed a friend or trusty agent so to take him, or that he has
authorized a person to whom he has hired or bailed him
to take him with him, at his discretion.   Even if all this
had been done in the same boat, it would not authorize
a subsequent transportation between the same points, at
the mere request of the slave, much less if his previous
trips had been in another boat, and unknown to the per-
sons who should thus receive him at his own request.
The passing of a slave from Kentucky to Ohio, no matter
how often, and though with his owner's consent, can fur-
nish no ground for inferring a license to pass at his own will
and alone, if on every occasion he has gone in the charge
of a free man having authority from his master to control
him.

Regarding these principles as correct in reference to the
subject, we cannot concur in the opinion, that the writing
of 30th of August, 1837, signed by Graham, should be
regarded as a sufficient authority to transport the boys
Henry and Reuben, at their own will, from Louisville to
Cincinnati, or elsewhere out of the State.   It is not an
authority to them to pass at their will and pleasure, but
an authority to Williams to take them with him at his
discretion.   It was intended for Williams, as is evident
from its general tenor, and especially from the postscript.
It was to be the evidence of his interest in the two boys,

*Margin notes:*

GRAHAM
*vs*
STRADER, &c.

A permission from the master or owner of a slave is necessary to authorize the master or the owner of a steam boat to convey a slave out of the State on a boat. It cannot be justified by proof that the master had himself taken or permitted another to take such slave out of the State on other occasions.

of his right to control them, and of his right to take them with him out of the State, without incurring liability. It does not appear ever to have been in their possession, but was properly kept by Williams, who produced it on one occasion as evidence of his right to take the boys to Indiana. It is a license to no body else to take the boys out of the State, and so far it may be said to be special; and it is limited in duration, not indeed by reference to years or months, but by reference to the circumstances to which it is made applicable. It ceased to be a license even to Williams, as soon as the boys were withdrawn from his custody, as they had been for one or two years before they were taken on board the Pike. And as he was not with them, and had no agency in their asportation, it could not have been regarded as an authority to the officers of the boat, even if it had been exhibited to them at the time. But it is not pretended that it had ever been seen or heard of by any one connected with the boat, until long afterwards. It may be assumed that the defendants knew nothing of it until after they filed their first answer, and it was probably then procured from Williams. And as it does not appear that any persons connected with the Pike, when these boys were taken on board, had any knowledge of their ever having been on the river before, but the contrary is to be inferred from the depositions of several of them taken in the case, we do not perceive that either in the paper referred to, or in the connection between Williams and the two boys, Henry and Reuben, or in any thing which occurred under it in pursuance of the authority conferred by Graham, the defendants or their agents in the navigation of the boat, had any license or permission from him to take the two slaves from Louisville to Cincinnati.

It may be proper to say further, with regard to this paper of August, 1837, that although it bears evidence of the great confidence which Graham had in the two slaves therein named, yet as the expression of that confidence should be understood in reference to the disposition made of the slaves in placing them with Williams, and to the control and license given to him, it cannot be made the basis of inferring a larger license or control in Williams

than is expressed, much less for inferring a license to the slaves themselves, or to another in regard to them, which is not expressed nor apparently contemplated. The conjecture, that while that confidence continued, he would, if asked, have permitted the slaves to go to Cincinnati without a master, could not have been regarded as a permission for them to go, if or when they chose; and the confidence expressed in August, 1837, may not have been felt in January, 1841. Besides, this was no proclamation to the public, of his confidence in the slaves, but an expression in a private paper, of that confidence which justified its provisions. And the expression of it might have been intended as a means of securing that obedience and fidelity which is assumed to exist. Without carrying the argument further, we are of opinion that this writing on its face, furnishes no authority for the asportation of Henry and Reuben, in the winter of 1841, and no ground for dismissing the bill as to them.

GRAHAM
vs
STRADER, &c.

II. It is contended, however, that the bill was properly dismissed as to them, because, under the authority contained in the writing referred to, and therefore with the consent of their owner, the slaves, Henry and Reuben, were taken into the free States north west of the Ohio, where, by the ordinance of Congress, for the government of the north western territory, embracing those States, slavery was prohibited, for the purpose of working, and did there work as slaves, for wages received by Williams or themselves, and that they thereby became free before the asportation complained of, and consequently, that the complainant has no right to complain of that act, or to recover damages therefor. It is on the other hand, urged as a sufficient answer to this argument, that the defendants cannot assert a right to freedom in Henry and Reuben, under the laws of Ohio and Indiana, which they did not themselves assert, and thus try the question of their freedom, in this collateral way. But if Henry and Reuben, after being taken by Williams to Ohio or Indiana, for the purpose of performing with him as musicians for a reward to be paid to him or them, and after a sojourn there of a few hours spent in that employment and instruction or amusement, chose to return with him, and

The owner of a slave residing in Kentucky does not forfeit his slave by taking him to Indiana or Ohio himself, or permitting another to do so, where the object of the visit is only temporary for a few hours of pleasure or amusement, or travelling through the State, and especially where no right to freedom is asserted by the slave whilst there.

then had asserted, before the tribunals of this State, a right to freedom under the ordinance referred to, or any other laws of Ohio or Indiana, we are far from admitting that they could have been pronounced to be free on any such ground.

With regard to any particular laws, which may have been passed on this subject, by either of the States referred to, we have no judicial knowledge; nor has it been asserted in argument that there are any such bearing upod the immediate subject. No question, therefore, arises as to the operation of such laws, or as to the power of enacting them.

We know that the ordinance referred to declares, "that there shall be neither slavery nor involuntary servitude in the said territory," &c., and that the States which have been formed in that territory reject slavery as an institution. But while it may be admitted, that in consequence of this principle, no citizen or inhabitant of one of those States can hold another person as a slave in that State, it does not follow, and we do not admit that the citizen of another State, whose laws recognize and establish this species of property, loses instantaneously and forever, by the mere force of this general principle, all dominion and right of property in his slave whom he has taken with him in travelling through one of those States, or in a temporary and momentary sojourn for a particular purpose of business or pleasure, so that upon the voluntary and immediate return of both into their own State, the pre-existing relation of master and slave must, in view of their own laws, be regarded as at an end.

In the case of *Rankin* vs *Lydia*, (2 *A. K. Marshall*, 467,) it was decided by this Court, that a master remo-ving with his slave from this State to Indiana, then a territory, with the intention of residing there, and having become actually a resident there, and made a registry under the laws of the territory, of Lydia, whom he had taken as a slave from Kentucky, lost thereby his dominion as a master and owner over her, and could not resume or re-create it by bringing or selling her back to Kentucky. But in the same case it is satisfactorily shown by the Court, that the ordinance was intended to apply to the in-

habitants of the North Western Territory, and not to mere travellers or temporary sojourners. And although the principle declared in the ordinance has been since adopted into the Constitutions of the States which have been formed in the territory for whose government it was in. intended, we do not admit that as a declaration, either of the ordinance or of the Constitutions of those States, it can, by its own mere force, produce the effect contended for.

If it were conceded that in consequence of the establishment of this principle in any State, the laws of that State may not only refuse their aid to a master voluntarily bringing his slave within its territory, even for a temporary purpose, to enforce his claim of dominion while there, but may aid the slave in resisting that claim, and thus enable him, if he will, to remain there as a freeman; and this seems to be giving to the principle its fullest effect; still it does not follow that the master, in thus subjecting himself to this temporary suspension of the legal right of enforcing his dominion, would incur any thing more than the hazard of losing it forever. He certainly is not to be understood as renouncing it when he takes the slave with him as a slave, with the intention of bringing him back immediately as such. And if the slave, without resorting to such means of resistance as the laws of the foreign state may have offered, acknowledges his subjection while there, and returns with his master in a state of servitude, we perceive no principle which would afterwards entitle him to claim his freedom in the domestic forum, on the ground that he might have asserted it in the foreign State, and could not have been compelled to return. Both master and slave having gone from their own country, not with a view of becoming domiciled in another, but for a merely transient purpose, and having, in accordance with their intention, returned without any visible change in their relations, their relative condition under their own laws, will remain the same as if they had never gone. What effect should be given here to the sentence of a foreign tribunal which, disregarding our laws upon this subject, should, on the ground that slavery is inconsistent with its own laws, wrest the slave from

A master of a slave residing in Ky. and taking his slave with him to Ohio for a temporary purpose, is not to be understood as renouncing his right to his slave, and on the return of the slave to Ky. he cannot, on that ground, assert right to freedom.

his master while on a temporary visit in another State, and whether if the slave should afterwards return as a free man, he would, by our laws, be held subject to his former condition, need not be considered. Whatever, in such a case, might be the law of comity, or of humanity, or of individual right, it seems to us that it would be placing our laws and policy in subordination to those of a foreign State, if we were to say that one of our citizens has lost his right of property in a slave, which is valid here, by the mere force of a declaratory law of a foreign State, that there shall be no slavery within its territory: when he has entered that territory with his slave, not with a view of attaching himself to it, or of subjecting himself to its laws, or of renouncing the benefit and protection of his own, but for a merely temporary and legitimate purpose. If our law on the subject might meet with so little respect in a foreign State, as not to be allowed to preserve this right of property in our citizen, when the foreign tribunal is appealed to, surely it would be carrying the principle of comity to a most unwarrantable length, to deprive him of his property here, when he has brought it back without any appeal having been made to the foreign law while the subject was within its territorial jurisdiction. In favor of a concession which we can but regard as in some degree derogatory to our laws, as well as to the rights of our citizens, we have been referred to no authority. But on the contrary, we find that the principle which we have asserted, that a slave returning voluntarily with his master from a free State, is still a slave by the laws of his own country, is sustained by the opinion of eminent jurists even among those who have maintained that by an appeal to the foreign law while within its jurisdiction, the slave may obtain the benefit of the constitutional principle which prohibits the existance of slavery. Judge Story, in his commentary upon the conflict of laws, after intimating, in the 95th section, that in the free States of America, as in England, a slave coming within the territory, (except as a fugitive,) becomes free, goes on in the 96th section to say that, "it is a very different question how far the original state of slavery might re-attach upon the party, if

he should return to the country, by whose laws he was declared to be, and was held as a slave," and quotes the opinion of Lord Stowell, (in the case of the slave Grace, (2 *Hagg. Adm. Rep.* 94, 113, 114,) that upon such a return of the slave to his original domicil, the state of slavery would re-attach upon him. In a note to the same section is published at large the opinion of Chief Justice Shaw, in the case of the *Commonwealth of Massachusetts* vs *Aves*, (1836,) in which case it was determined that a slave taken temporarily to Massachusetts with the master, was entitled to the ordinary remedies of the law for freeing him from restraint; and the learned Judge, after stating the question now before us, as one not necessary to be decided in that case, intimates his own opinion very clearly, by saying: "From the principle above stated, on which a slave brought here becomes free, to-wit: that he becomes entitled to the protection of our laws, and there is no law to warrant his arrest and removal, it would seem to follow, as a necessary conclusion, that, if the slave waives the protection of these laws, and returns to the State where he is held as a slave, his condition is not changed."

Some stress seems to be laid on the fact that Henry and Reuben performed services while in Ohio and Indiana, for which wages were paid, and that they went there for that purpose, with the consent of their owner. But if all this be conceded, we do not see how it can affect the question. Williams was, at the time, their master. They went with him and under his authority, and performed the services under his engagement and for him. And it is to be presumed that wages were paid to him, or if to them only by his directions and in such portions as he chose. But this we deem immaterial. They were still sojourners for a transient purpose, not inhabitants nor residents, and voluntarily returned with Williams. They were not even hired by him to inhabitants. If a master may take his slave into one of these States, he may surely receive and direct his services while they are voluntarily rendered; his charging and receiving pay for those services when directed to the benefit or amusement of others, is itself an assertion of right and domin-

The owner of a slave who resides in Kentucky, who permits his slave to go to Ohio in charge of an agent, &c. for a temporary purpose, does not forfeit his right of property in such slave.

ion over them, which cannot operate either as a renunci-
ation or a forfeiture, and as he might in this State, give
or allow them a part of what was earned, without affect-
ing his right of dominion over them, he might do it there.
We cannot concede, therefore, that Henry and Reuben
became free by reason of any of the facts referred to.
And the same reasoning and conclusion will be applica-
ble to the case of George, if as is contended, he can, un-
der the evidence, brought within the same or similar con-
ditions.

III. Being of opinion that the writing of August, 1837,
furnishes no ground for discriminating between the com-
plainant's claim for the asportation of Henry and Reu-
ben, and for the asportation of George; we proceed to
enquire how far his claim and right of suit upon these
statutes, should be affected by his conduct after the two
slaves were withdrawn from the control of Williams, in
allowing them to remain for a considerable portion of
each year, in Lexington, without a master, with liberty
to hire out their services as musicians there, and in the
neighboring towns, and thus at their own will to travel
about the country, and as one witness states, to go where
they pleased. First then, it seems to us that there being
no instance in which the slaves, after the connection with
Williams had ceased, had gone out of the State, or had
even gone upon the river in a steamboat, and the terms
of the license given to them while stationed at Lexington,
not being such upon fair construction, as to authorize
them to go out of the State, and especially not allowing
them to go to a free State; and moreover, there being
no pretence that the persons connected with the steam-
boat Pike in the winter 1840–41, had any knowledge of
the license given, or the liberties taken under it, we think
this license and the practice under it, neither constituted
nor proved a permission to take the slaves from Louis-
ville to Cincinnati, and therefore, cannot protect the de-
fendants from the liability fixed upon them by the statute,
for the unlawful act of removing them without the per-
mission of their master. And secondly: Although the
conduct of the plaintiff in regard to these slaves, was
contrary to the laws and policy of the State, and furnish-

*That the owner of a slave in Kentucky permitted him to go to Lexington and to be employed there and at the surrounding towns and villages as a musician, did not imply an authority or license to the owners and masters of steam boats to convey him out of the State.*

ed an evil example which was calculated to withdraw other slaves from their duties, and to create in them a desire for similar indulgencies, yet these considerations do not, as we think, affect the question whether the law was not also violated in taking these slaves from Louisville to Cincinnati, without permission, nor justify the act if done; nor does the violation of one law by the complainant preclude him from claiming damages for the violation of another law by the defendants, so far as he has been injured thereby.

IV. Assuming then, that these slaves were taken from Louisville to Cincinnati, on the steamboat Pike, belonging to the defendants, without the permission of their master, the complainant has a right to maintain this suit for the recovery of damages, and the only remaining question is as to the criterion of damages, and the considerations which may properly enter into their assessment. If the slaves are hopelessly and irrecoverably lost, their fair value, or if there be a chance of recovery, their fair value deducting that chance, constitutes the great item of damage or loss sustained by the complainant. But how, in the absence of the slaves, is this fair value to be estimated? If they were present, it might be ascertained by putting them to sale among persons acquainted with their qualities, their capacities, their habits, and their character; and their value would be the price which they would command among such persons. In their absence their value cannot be ascertained by so precise a test, but in making the estimate, the jury should undoubtedly take into consideration the same circumstances which might be rationally supposed to affect their value in the mind of purchasers, and they should give to each of these considerations, and also to the opinions of witnesses having the requisite knowledge, such weight as in their judgment it is entitled to have. They had a right, therefore, to take into consideration their qualities as musicians, which they were precluded from doing with regard to George, by the instructions of the Chancellor. For the same reasons they had a right to consider the appearance, and manners, and address of these slaves, their acquirements in literature as well as in music, their habits of subordi-

GRAHAM
vs
STRADER, &c.

The measure of recovery by the owner of slaves against the master or owners of steamboats for conveying them out of the State, is the value of the slaves, if hopelessly lost, if not hopelessly lost, the value less by the chance of recovery. In estimating the value their capacity for business, age, habits, character, habits of subordination, & whatever else affected their value, would be proper to be considered.

GRAHAM
vs
STRADER, &c.

nation or of independence, the liberties which had been allowed to them, and the effect of all these circumstances, not only upon the value of their services, but also in generating a restlessness under restraint, and a desire of freedom, and in affording facilities and opportunities of escape, even if they had not been taken on board the Pike ; and they had a right to determine how far any of these considerations should operate to enhance or diminish the fair value of the slaves as such. The Chancellor, therefore, erred to the prejudice of the defendants in withholding these considerations from the jury as proper elements for their estimate of the damages recoverable for the asportation of George. But the jury should regard the circumstances referred to as they existed before the slaves were taken on board of the Pike, and as they then affected their value as slaves.

Musical instruments, music books, &c. taken off with a slave by a steamboat, constitutes a part of the value of a slave, a musician who used them in the service of his master, and their value may be recovered with the value of the slave.

With regard to the books and musical instruments which the slaves had in their possession, they were probably the proceeds of their own earnings, which had been allowed to them, and may not have been intended to be claimed from them by their master; they may be considered, however, as a part of their acquirements as musicians, essential to them in that profession, and should, in that view, be included in the estimate of their personal value as musicians.

When a slave has been taken out of the State by a steamboat, and escaped from his owner, the reasonable expenses of the master in prudent efforts to recover the slave, may be recovered in addition to the value of the slave, of the master or owner of the boat.

Upon the subject of the expenses incurred in the unsuccessful attempts to recover the slaves, we have had some difficulty. But as in case they had proved successful, the reasonable expenses of the recovery would certainly have constituted damages occasioned by the unlawful act of the defendants or their agents, and would have been recoverable as such ; so we think that although the effort has failed, yet if it was prudently made, that is, if the prospect of success authorized the attempt, of which the jury should judge, the complainant should be entitled to recover damages to the extent of the reasonable expenses incurred on that account. And although after ascertaining where the slaves were, it should be deemed useless and therefore imprudent to have incurred any further expenses for their recovery, still he should be entitled to the expense reasonably incurred in ascertaining

their condition and the probabilities of recovering them. Upon the subject of these expenses, which seem to have been excluded altogether by the instructions of the Chancellor, he erred to the prejudice of the complainant. The deposition of Armstrong, the master of the boat, not having been objected to, should not have been rejected.

Wherefore, the decree is reversed and the cause is remanded for further proceedings and enquiry as to all three of the slaves, on principles consistent with this opinion, and for decree thereon; and it will be proper to make Armstrong, the master of the boat at the time of the asportation, a party. Some errors for which the decree is reversed, having been committed to the prejudice of each party, on the enquiry instituted with regard to George, the effect of which in enhancing or diminishing the damages cannot be ascertained, each party should pay their own costs on the writ of error prosecuted by the defendants, who have stated in their principal complaint, that the bill was not dismissed as to George. But on the writ of error prosecuted by the complainant, founded mainly upon the erroneous dismissal of the bill as to Henry and Reuben, he is entitled to his costs in this Court.

*Harlan & Craddock and Robertson* for Graham ; *Duncan* for Strader, &c.

