Bartley, C. J.
Although 1'concur in the judgment pronounced, A differ so essentially with the majority of the court as .to the main *676 ground upon which the decision has been.placed, that it is proper that I should state my own views fully in a separate opinion.
The original suit was instituted in the court of common pleas of Clermont county, on the 24th day of July, 1852, in which the plaintiff in error declared in assumpsit, on two promissory notes, dated August 22, 1848, each payable to plaintiff, in the sum of one hundred dollars ; one in two, and the other in three years, after date, and ■each executed in the State of Kentucky. Poindexter, the principal in the notes, was not served with process. The defendants plead : 1. Non-assumpsit; 2. That these notes were given upon a promise -of the plaintiff that he would, in due form of law, set free Henry Poindexter, then claimed by him as his slave, but that plaintiff had not kept said promise; 3. That said notes were given in consideration that the plaintiff, in whose service said Henry Poindexter had .been, as his slave, for many years, would set him free ; whereas, in *truth, said Poindexter was at that time legally free, and [676 not a slave, by means of the fact that the plaintiff had, on several ■occasions prior to that time, permitted said Poindexter to come into the State of Ohio, there to remain for a time, to wit, .one day, by means whereof he was emancipated. Issue was taken on these pleas.
After judgment for the defendants, in the common pleas, the -cause was appealed to the district court, where judgment was also rendered for the defendants; and to reverse this judgment this proceeding in error is brought.
A bill of exceptions was taken on the trial, in the district court, •setting out the evidence, from.which it appears that prior to and at the time of the date of the notes declared on, the plaintiff resided in Campbell county, Kentucky, about one mile from the Ohio river, having Poindexter in his service, as his slave, worth about ■one thousand dollars ; that Poindexter bargained with Anderson, his master, for his freedom, and gave him the notes declared on, and two others, for one hundred dollars each, falling due subsequently ; that the defendants served with process signed the notes as sureties for Poindexter; that the contract icas made and the■ notes given in the State of Kentucky; that on the delivery of the notes-by Poindexter to plaintiff, the latter relinquished his control over the former as his slave, and agreed that as soon as the notes were paid he would give him his freedom, papers; t.hat after the arrangement the plaintiff employed Poindexter to work for him for a time in *677, 678 Kentucky; subsequently he (Poindexter) came into Ohio to work, and was in this state at the time of the commencement of the suit; and that prior to the date of the notes Poindexter, while in the service of Anderson, as his slave, had been permitted by his master, on several occasions, to go across the river into the State of Ohio, on errands, being once sent by the plaintiff over the river, 677] to New *Riehmond, for a physician; but that Poindexter always voluntarily returned, without delay, from such errands, to his master, in Kentucky. The intervention of a jury having been waived and the cause submitted, the court found for the defendants. The plaintiff moved for a new trial, but the motion was overruled and judgment rendered; whereupon the plaintiff took his bill of exceptions.
It is now assigned for error that the finding of the court was against the law and the evidence; and that, upon the case made out the court erred in rendering judgment for the defendants, instead of the plaintiff.
That the contract in this case, having been made in Kentucky, must be governed by laws of that state controlling the legal capacity of the parties, as well as its subject-matter; that Poindexter, the principal in the notes, being the slave of the plaintiff, had no legal capacity, under the laws of that state, to make a valid contract with his master; that he was not set free in accordance with the municipal regulations of that state; that a mere executory agreement of the master with his slave (or even with another person), that he would, at a future time, or on a future contingency, set the slave free, has no legal efficacy in that state, and therefore can constitute no legal consideration for a contract (Willis v. Bruce, 8 B. Mon. 548, and Carter v. Sepper, 5 Dana, 261); and that the contract of suretyship, being merely accessory to that of the principal, is without any validity when that of the principal is absolutely void, are propositions to which I readily accede. And upon this ground I give my assent to the judgment in this case.
But the main ground upon which the decision of the case is placed, by the opinion of the majority of the court, is, that Poin678] dexter, by means of his having been sent into *Ohio by his master, on an errand, prior to the giving of the notes, although he had returned voluntarily, and without delay, to the service of'the plaintiff, became a freed man, and that, therefore, the notes, being given for the purchase of his freedom, were without consideration. *679 It is not pretended that Poindexter had been domiciled in Ohio, or . Oven that he had entered the borders of the state for a temporary residence. On the contrary, he was simply in the state, in itinere, on business not requiring a prolonged or indefinite sojourn, and, as far as residence is concerned, not distinguishable from that of a person in transitu. The plea goes no further than an averment that he had entered the territory of the state, and left, on his voluntary return to the service of his master, in Kentucky, on the same day. The effect of the doctrine on which the decision is placed is, that if a person, who is a slave by the laws of another state, should, by the consent of his master, even in itinere, or upon an errand, “ step upon the soil and breathe the atmosphere of Ohio,” he becomes a freed man, and is forever absolved from the right of his master to his servitude in the state to which he belongs, even after his voluntary and immediate return to the service of his master; and that he must be so regarded by the courts of Ohio, whatever may be the laws of the state of his domicile to the contrary. This position, as I humbly conceive, is novel in our jurisprudence, and has so important a bearing upon cases of frequent occurrence affecting the harmony and safety of the country, that I can not consent to pass it without an explicit statement of the grounds of my dissent. ■
Was Henry Poindexter a slave at the time the promissory notes were given to the plaintiff in the State of Kentucky? That he had been the plaintiff’s slave, under the laws of Kentucky, some time prior to the execution of the *notes, is' admitted by the pleadings [679 and shown by the proof;, and that, by the transaction in which the notes were given, Poindexter and his sureties admitted the fact that he was, at that very time, such slave, must be conceded.
And in no ordinary case, in a court of law, would a party be allowed to contradict his own solemn admission, in a matter of contract, upon which he had induced the other party to act, and part with his claim or property. It is not pretended in the defense that the plaintiff had obtained his right to the servitude of Poindexter by any unfairness or illegality. And while it appears in the proof that he was worth one thousand dollars as a slave, and which, of course, the plaintiff could have received for him on a sale, yet that the plaintiff, governed by an indulgent regard for the wishes of Poindexter, agreed to set him free for the sum of four hundred dollars, payable on extended credits. Under such .circumstances, shall one party, after he has induced another to part with his claim of *680 property on a pretended contract, be allowed to come into a court of justice, and either by stultifying himself, or admitting that he had been practicing an artifice on the other party, avoid his liability, without restitution, or placing the other party in the situation he was before ? In such case, the principle of estoppel would ordinarily be applied.
But it is said that Poindexter and his sureties were ignorant of' the rule of law by which he had become free, and that they gave the notes under a mistaken .belief that he was a slave at that time. Without stopping to consider the application of the rule ignorantia juris non excusat, I proceed at once to the inquiry, was Poindexter legally held to the service of the plaintiff at the time of the execution of the notes ? And the inquiry is not whether Poindexter was to be considered a slave according to the laws of Ohio, but whether 680] he was actually a slave under *the laws of Kentucky, where he had been, and was actually residing at that time. The inquiry here as to his condition involves simply the consideration of the-contract for the purchase of his freedom. Whatever might hav& been the laws of Ohio in that regard, if the plaintiff could’ have held him to service under the laws of Kentucky, or even had it. been a controverted question whether that was the case or not, it. would have been sufficient to furnish a valuable consideration for the contract. It is a principle of general application, universally recognized, that the lex loci contractus must govern as to the nature and validity, as well as the interpretation of contracts. And this is founded not alone upon the necessity and commercial convenience, but also upon the fact that parties are presumed to contract in contemplation of the existing laws of the place; and, so far as such laws have relation to the subject-matter of the contract, they enter into and constitute terms in the conditions of the contract itself. Where a contract is made in one state, but performance is required in another state, or where one or both parties reside in one state, and the contract is made in another state, questions are sometimes made as to the local laws governing the contract. And it is held thatwhile considerations affecting the validity of contracts, which have their foundation in the state or condition of a person, must be governed by the laws regulating the state and condition of the person, which is the law of his domicile; yet considerations affecting rights arising out of the nature or subject-matter of the contract, must be always governed by the laws of the place of 'the contract. *681, 682 But where the place of the domicile of both the parties, and the-place both of the making and of the performance of the contract are the same, the rule, I believe, is, without exception, that the local laws of that place must' govern everywhere as to the nature, validity, *and interpretation of the contract. Hence it is [681 that contracts made in one state, and valid by its laws, may be enforced in the courts of another state, notwithstanding the fact that, had they been made in the latter state, they might have been invalid by the operation of its local laws affecting either their subject-matter, or the state or condition of the person of either of the-parties.
It'appears in this case, that the State of Kentucky was not only the place of the contract in question, but also the place of the domicile of both the parties. It is not pretended that at the time of the making of the contract, Ohio was the place of the domicile of Poindexter, by birth, and it certainly had not then become such by choice.
The constitution and laws of Kentucky recognize slavery as a. legal condition, and regulate the relation of master and slave, by providing guaranties for the security of the rights of the master, charging him with the custody of his slave, and enjoining upon him the duties essential to the maintenance and security of the relation. And the mode of manumission in that state is expressly prescribed, and can be effected only by a formal deed of emancipation, executed through the agency of public authority.
And, inasmuch as slavery has existed under various forms and modifications, in different ages, and different nations of the world, it is proper to add, that the relation of master and slave, as it exists in Kentucky, does not give the master absolute 'dominion over the life and person of the slave ; and while it gives to the former the exclusive right to the labor or services of the latter, and the right to direct and control his actions with that view, it imposes upon the master reciprocal obligations for the support and maintenance of the slave, at all times, whether in sickness, in health, or in old age. And the fundamental law of that state contains a provision, “ to oblige the owners of slaves *to treat them with [682 humanity, to provide for them necessary clothing and provisions, and to abstain from all injuries to them, extending to life or limb.” Constitution of the State of Kentucky, art. 1, sec. 1.
. The status or civil and political capacity of a person, being connected with the social and political organization of a state to which *683 he belongs,' must be regarded everywhere as determined by the civil regulations of the place of his domicile. It is said that every state or nation possesses an exclusive sovereignty and jurisdiction within its own territory; and that its laws affect,and bind all persons and property located within it. It has power to regulate the mode and condition under which the property may be acquired and held; the capacity, state, and condition of all persons domiciled therein ; as well as to prescribe the remedies and modes 'of proceeding in the administration of justice. This is essential to the sovereignty of every distinct and separate community of people.
And it appears to be well settled, that the caj)acity, state, and condition of a person, as to acts done, rights acquired, and contracts made, must be regarded everywhere as fixed and determined by the laws of his domicile; so that, if these acts, rights, and contracts have validity there, they will be held equally valid everywhere ; but if invalid there, they will be held invalid everywhere. Story’s Conflict of Laws, sec. 101.
Although the status of a person is not indelible, but liable to be changed by a change of domicile, yet the domicile is not liable to change by a mere temporary absence from it, the intention of returning to it still continuing. On this subject, Mr. Justice Story, in his work on “ Conflict of Laws,” sec. 44, says :
“ Two things must concur to constitute domicile: first, residence; an&i 688] *secondly, the intention of making it the home of the party. There must be th4 fact, and the intent; for, as'Pothier has truly observed, a person can not establish a domicile in a place, except it be animo et facto. However, in many cases, arcual residence is not indispensable to retain a domicile, after it is once acquired ; but it is re-retained, animo solo, by the mere intention not to change it, or to adopt another. If therefore, a person leaves his home for temporary purposes, but with an intention to return to it, this change of place is not in law a change of domicile. Thus, if a person should go on a voyage to sea, or to' a foreign country, for health, or'for pleasure, or for business of a temporary nature, with an intention to return, such a transitory residence would not constitute a new domicile, or amount to an abandonment of the old one ; for it is not the mere act of inhabiting in a place which makes the domicile ; but it is the fact, coupled with the intention of remaining there, animo manendi.”
It is an established principle, that the personal status of a party, as fixed by the law of the place of his domicile, is regarded as accompanying him in other countries, so long as his domicile remains *684 unchanged. See Story’s Conflict of Laws, secs. 51, 52, 60, 64-66; 2 Kent’s Com.; Pattee v. Brown, 5 East, 131; 1 Huberus, Lib. 1, tit. 3, sec. 12.
Thus the relation of husband and wife, if valid by the laws of the domicile of a party, has a legal ubiquity of obligation, and will be regarded as valid in every other country where the party may go. So also with the relation of parent and child. And if by the laws •of the place of domicile, a child become of age, and discharged from the control of the parent at the age of twenty-one years, he will bo regarded as having reached his age of majority, if he go to a country where a person does not become of age till he roach his twenty-fifth year. And if a parent, domiciled in a country where the age of majority is fixed at twenty-five years, be sojourning in this state with a son over twenty-one, but under twenty-five years of ago, the rights and the obligations of the relation of parent and child would be regarded and enforced. So, also, is the relation of guardian *and ward, and likewise the relation of master and appren- [684 tice, regarded in different countries, and the rights and obligations thereof enforced.
This rule, however, is subject to the qualification, that where the rights and obligations incidental to the personal status are in contravention of the laws of another country, in which the party may be a sojourner, they may be, for the time being, to some extent, ■suspended. But- although the rights and obligations incident to the capacity, state, or condition of a party, may bo thus temporarily suspended for want of the authority of law to support, or to enforce them, they are not thereby abrogated, and the status of the party changed by the operation of the laws of the place of the sojourn. It is true, if a party remove with the intention of changing his domicile, as soon as he arrives in the country or state of his new home, Ms status is at once changed, and fixed by the laws of the place of his new domicile. And what amounts to a change of domicile, as affecting his status, may depend somewhat upon the laws of the country to which the party may go. If he remove from the place of his domicile to another country, with the intention of residing there temporarily, but for a considerable and indefinite period of time, or for a number of years, it may effect a change of domicile. But it may be said without fear of contradiction, that it never has been held, in any well considered case, by any court, in any country, that a change of domicile may be effected, by the act *685,686 of a person leaving Ms home for a mere temporary purpose, and simply passing through another country on a journey, or going into it on business requiring no delay even for a temporary residence, and immediately returning to the place of his home.
And not only do the rights and obligations incident to domestic 685] relations, but also the rights of personal or *movable property, as fixed by the jus domicilii, accompany the person of the owner in other states or.countries. And this, in the words of Lord Lough-borough, in Sill v. Worswick, 1 H. Bla. 690, “is a clear proposition, not only of the law of England, but of every country in the world where law has the semblance of science.” And in the important case of Birtwhistle v. Vardill, 5 Barn. & Cress. 438, Lord Chief Justice Abbott, recognizing this doctrine, said: “Personal property has no locality. And even with respect to that, it is not correct to say, that the law of England gives way to the law of the foreign country; but, that it is part of the law of England that personal property should be distributed according to the jus domicilii.” “ And the same doctrine,” says Story, in his Conflict of Laws, sec. 380, “ has been constantly maintained, both in England and America, with unbroken confidence, and general unanimity.”
This doctrine, that rights of personal property, and rights and obligations incident to the domestic relations, acquired by the laws of the place of domicile, will be regarded and enforced in other states and countries, rests upon a principle of international jurisprudence, founded upon the comity of nations, and has so general a sanction among civilized nations, that it is now treated as a part of the “jus gentium.” It does not arise from any extra-territorial operation of the laws of one country within the limits of another-In the words of Chief Justice.Abbott, “It is not correct to say, in respect to this, that the law of Eng'and gives way to the law of the foreign country.” On the contrary, it becomes a part of the municipal law of the country adopting it. And because it is founded on the comity of nations, it is no less the law of each country where it is enforced. In Bank of Augusta v. Earle, 13 Pet. 589, Chief. Jus 686] tice Taney said, on this subject:' “ The ^comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which *687 they belong, that courts of justice have constantly acted upon it, as a part of the voluntary law of nations.”
This rule of law, founded upon comity prevailing among the distinct and independent nations of the earth, rests upon still higher obligations among the people of the several states of the American Union. Having entered into a league of friendship and solemn .compact with each other, as the basis of a confederated government, designed to provide for the common defense and general welfare of the the several states, to secure to each its liberty, and to establish justice,, and insure domestic tranquility; they established intimate relations,, and laid the foundation for unrestricted and free commercial and social intercourse between the people of the several states; and that, too, when the relation of master and slave actually existed, to some extent, in every state of the confederacy. Having guaranteed to the people of each state inviolability in their rights of private property, and security in their domestic tranquility; having declared that the powers enumerated in the constitution should not be construed to deny or disparage the rights retained by the people; and having -guaranteed the sovereignty and independence of each state, subject only to the powers delegated to the confederacy, they recognized the relation of master and servant, secured the return of fugitives from servitude, and provided, expressly, that “full faith and credit shall be given, in each state, to the public acts, records, and judicial proceedings *of every other state;” and that “the citizens of each state [687 shall be entitled to all the privileges and immunities of citizens in the-several states.”
United upon such intimate relations, for such purposes, and upon, such terms, under the same confederated government, the people of each state are bound, if not by the express obligations, certainly by the spirit and true intent of the compact, to regard with the strictest fidelity, and in the most amicable spirit of reciprocity, all the peculiar rights of the peopfie of each other state, which separate- and independent nations, in their intercourse with each other, recognize in regard to the ordinary rights of persons and property,, upon the ground of comity. Without this, the harmony required, to insure “ domestic tranquility.” and the free commercial and social intercourse between the people of the several states, essential to the great purposes of the confederacy, can not be secured. The citizens’ of each state can not expect long to enjoy “'all the privileges and immunities of citizens in the several states,” unless each state main *688 ■tains a scrupulous regard for comity and reciprocity in this respect. A citizen of Ohio, passing through Kentucky, or going into that ■state on business, either with his property, or with persons under his guardianship, would expect to be protected in his rights of per•son and property, held by the laws of his place of domicile, under-“full faith and credit ” required to be given to the public acts of his ■ state. But if a citizen of Kentucky can not pass through Ohio,' .accompanied by his servant, or send his servant into this state on a mere errand, without being divested of his rights secured to him ■by the public acts of the state of his domicile, there is an end to that comity and reciprocity between the two states required by their relations toward each other as members of the federal compact, 688] which is essential to harmony and unrestricted ^intercourse ¡between the people of the two states. And such a course on the •part of Ohio will subject her citizens to a liability to retaliatory measures on the part of Kentucky.
If Ohio and Kentucky were separate and independent nations, .absolved from all obligations under the federal compact, Kentucky could doubtless secure, by treaty stipulations,protection to the rights of persons and of property authorized by her own laws, and effective provisions against the invasion of such private rights, in the ■commercial and free intercourse between the people of the two states which is manifestly the interest of each. But if the citizens ■of Kentucky can not be protected in their rights vested in that state, while mere travelers in Ohio; if the people of Ohio can be allowed to interfere with the local policy and domestic affairs of Kentucky, .and entice away negroes bound to servitude in that state; if the people of Ohio tolerate and encourage political movements, agitation, and incendiary publications, directly tending to disturb the •domestic tranquility of Kentucky, to instigate the negro there to insurrection and murder, and compelling the people of that state, as necessary measures of self-preservation, to prohibit the negro from being taught to read, and to impose rigid police regulations, which prevent all amelioration in the condition of the slave, and •cut off all progress in the cause of emancipation; if all this can b.e ■done consistently with the spirit and true intent of the federal compact, the federal Union must be found far less efficient as a protection to the people of the several states, in their local policy and private rights of person and of property, than mere treaty stipulations between states foreign to and independent of each other. *689, 690 But it is said that the constitution of Ohio declares all *men [689 free, and prohibits slavery and involuntary servitude, except for-crime, and that this provision of our constitution can not be abrogated or suspended by the operation of the laws of Kentucky. This is all very true, but it in nowise, as I humbly conceive, affects the question under consideration. No one would ever assert such an absurdity as that the fundamental laws of Ohio could be abrogated or suspended by the extra-territorial operation of the laws off a foreign state. It is undeniable that the constitution and laws of Ohio govern the stalus and condition of every person domiciled in the state. And if a person remove from another country into-Ohio, intending to make Ohio his home, he becomes subject at once, as to his rights of person and property, to the laws of Ohio ; and if his removal be from Kentucky, and he bring with him his slave, from the time of his landing in Ohio, the slave at once becomes free. This results from the operation of the laws of Ohio, in case-of a change of domicile, or of persons taking up their residence in this state. But when the citizens or subjects of another state or-country simply pass through or sojourn in Ohio, either on business or merely as travelers, they occupy a different relation, and are subject to regulations differing from those which apply to persons-domiciled or residing in the state. A standard author, of the highest character, on the laws of nation's, says:
“ The citizen or subject of a state who absents himself for a time,, without any intention to abandon the society of which he is a. member, does not lose his privilege by his absence; he preserves.' his rights, tad remains bound by the same obligations. Being received in a foreign country, in virtue of the natural society, the-communication, and commerce which nations are obliged to cultivate with each other, he ought to be considered there as a member of his own nation, and treated as such.
“ The state which ought to respect the rights of other nations, and,, 'in general, those of all mankind, can not arrogate to herself any power over the person of a foreigner, who, though he has entered her territory, has not become her subject.” Yattel’.s Law of Nations, 174.
* Again, the same author, on page 175, says:
“ The property of an individual does not cease to belong to him. on account of his being in a foreign country; it still constitutes a. part of the aggregate wealth of his nation. Any power, therefore,.. *691 which the lord of the territory might claim over the property of a foreigner, would, be equally derogatory to the rights of the individual ■owner, and to those of the nation of which he is a member.”
■ The provisions of the constitution of the state mentioned must, therefore, be construed as fixing the laws of domicile in Ohio, and .as governing the state and condition of those only who are, or who become, subjects of the state government. This certainly can not be otherwise. The language is general, and without exception, •declaring all men free and equal; yet it is conceded, that a fugitive from labor coming into Ohio from another state, is not free, but .subject to be returned to his master. And it must be conceded, that ambassadors, or other foreign ministers, might reside in Ohio, ■with their servants, and yet retain their domicile, with the rights incidental thereto, in the country which they represent, and to which they belong. In some countries, and in some of the states ■of the Union, special laws are enacted, regulating the privileges •and liabilities of sojourners, and transient persons within the state ; and those statutes, in some of the states, by express provision, fix :the period beyond which sojourning slaves from any of the slave-holding states shall not be allowed to remain. But we have no .such law in Ohio.
It is argued, that foreigners or non-residents coming into, or passing through the state, can not be allowed to violate the constitutional prohibition against the existence of slavery or involuntary .-servitude in the state. This is conceded. Nothing different is •claimed. The prohibition is against slavery or involuntary servitude as a state and, condition of man in Ohio. The slavery prohibited consists in the right of one person to hold another person and his pos691] terity *in perpetual bondage to labor in Ohio, without compen,-sation, save the reciprocal obligation of the master to support his •slave. And “ the involuntary servitude ” inhibited is the same thing, ■with the exception, that the bondage may not be for the entire life of the servant, nor involve his posterity. Now, it is not claimed, that a citizen of Kentucky can come into Ohio with his slaves, and assert a right to the perpetual labor of the slave and his posterity in Ohio; neither is it claimed, that a citizen of Kentucky can either bring, or send his slave into Ohio, and require of him, or coerce him to involuntary servitude in this state. But if a slave, sent into this .state on an errand, voluntarily does an act of service for his master; *692 ■or if a slave accompany his master in traveling through this state, And voluntarily serve his master on his journey, in neither of these ■cases is there any act of involuntary servitude. The constitutional •inhibition is against “ involuntary servitude;” and this is no more violated by a gratuitous voluntary act, than it is by an act done under the obligations of a contract. The real question, however, under consideration is, not whether a man in Kentucky can send ■or bring his slave into Ohio, and here require of him, or coerce him, to acts of involuntary servitude, but whether, after a slave has been in Ohio, by permission of his master, on a mere errand, performed ■an act of voluntary service, and then, voluntarily, returned, without delay, and without claiming Ms freedom, to his state of servitude in Kentucky, the actual status of the slave, as fixed by the laws of Kentucky, can be judicially recognized in Ohio. It is the mere ■question of the recognition in Ohio, of a legal right and condition incontestibly existing by law in Kentucky. The recognition in -Ohio, of the fact of an existing legal right in the State of Kentucky, is one thing, and a right to the involuntary servitude of a person in •Ohio, another and very different thing. If a *suit be brought [60S in Ohio, on a note given on the purchase of a slave in Kentucky, it will be conceded that the contract will be enforced, and that the -consideration can not be impeached. And yet this would be as perfect a recognition, in Ohio, of the legality of slavery in Kentucky, as that of authorizing a master to coerce the return of a slave to Kentucky, who came into Ohio on a temporary purpose by consent of his master. A mere act of voluntary service in Ohio can not be construed to be coercive or involuntary servitude. Much less can the mere recognition in Ohio of a legal right actually existing in Kentucky, be tortured by construction into a recognition of involuntary servitude in Ohio; and as it has reference to the operation of laws in Kentucky only, it is manifestly not giving an extra-territorial operation to the laws of that state. I am wholly unable, therefore, to perceive the infraction of the constitutional inhibition complained of.
That slavery is contrary to the policy of Ohio, as established by the constitution of the state, is certainly true. And I may be permitted to add, that no citizen of the state would more zealously and ■sincerely oppose any change in the fundamental policy of the state in this regard, than I would myself, because of the liability of the relation of master and slave to abuses; because of the demoralizing influences of those abuses upon society; and because of its impover *693, 694 ishing consequences upon the prosperity and energies of the community in which it exists. But the question under consideration is, not whether slavery shall be introduced into Ohio, but whether-there shall be that observance of comity in the unrestricted intercourse between Ohio'and the jieople of an adjoining sister state, which is essential to harmony and reciprocity, and a due regard for the spirit and true intent of the federal compact. Is it in contra-693] vention of the policy of Ohio, *to recognize legal rights as they exist in Kentucky, arising out of the relation of master and slave; or to recognize the actual status of a slave, as it in fact exists-by the laws of Kentucky, because the slave had been in Ohio,'although for a a mere temporary purpose, and, without claiming his freedom, had voluntarily returned to the service of his master in Kentucky? As I have already remarked, our constitutional prohibition is against slavery or involuntary servitude in Ohio. It does not. operate in any respect or manner whatsoever to prohibit slavery in Kentucky. I give full scope to the constitutional inhibition. No slavery or involuntary servitude, otherwise than for crime, can ever be allowed in Ohio. When a citizen of Kentucky brings or-sends his slave into Ohio, for temporary purposes, or in itinere, he can not compel him to perform a single act of involuntary servitude, or hold him in subjection one moment in Ohio, for the purpose of the performance of involuntary service in this state. But if a slave come into Ohio on an errand for his master, and voluntarily do the act, and return, this would not be involuntary servitude; nor would the slave, while in Ohio, be held in subjection for involuntary service in this state. When Poindexter came within the territory of Ohio, lie might have lawfully refused to perform the errand for his master, upon the ground that his subjection to the service of his master was in Kentucky, and could not exist in Ohio. So-also, if a citizen oí Kentucky pass through Ohio on a journey with his slave, he can not coerce the slave to acts of involuntary servitude in this state, or hold him in subjection for the performance of such service in-Ohio. And if, while sojourning in Ohio, the slave voluntarily perform acts of service for his master, this would not be in violation of the constitutional provision.
The laws of the several states constantly protect the citizens of 694] the other states in their rights of property, when *it is found within their respective territories; and no one has ever doubted their power to do so. And inasmuch as the legal right of property *695 in the service of a slave, in the states where slavery is authorized, is recognized, not only by the laws of nations, but by our national compact, which is the law of every state in the Union, this right, existing in a state whore slavery is authorized, is entitled to protection in another state, where the slave may be, without fault on the part of the master. Suppose a citizen of Kentucky with his slave wrecked, and thrown by accident on the shores of this state. The slave would not be a fugitive, and could not be arrested as such. He would be under the protection of our laws; yet it would scarcely be claimed by any, that the master could not, according to the laws which govern civilized nations in their intercourse with each other, be protected in his legal rights existing at the place of his domicile. If a law had been enacted absolutely prohibiting the ingress and egress in this state of that class of-persons, for any purpose, or in any manner whatsoever, it might be different. But as it is, this contravenes no rule of law, of morality, or of public policy. The inscrutable doctrine that a slave, nolens volens, becomes absolutely and forever free, the moment he touches the soil and breathes the air of a coumry, where slavery is prohibited, without a change of country or domicile, is ideal, and in contravention of the settled law relating to the status of persons, and the law governing the international intercourse of nations with each other. In Kentucky a man is not allowed to rid himself of his obligation to support his slave, when, from sickness or old age, he becomes unprofitable; but, if this doctrine of absolute freedom by merely touching the soil of Ohio, prevail, all that slaveholders in Kentucky have to do to rid themselves of all responsibility as to their unprofitable and useless slaves, is to send them ^across the river on errands, and thus, [695 they may fill the poor-houses, and infirmaries, in the counties of this state bordering on the Ohio river.
It is argued, however, that the moment a slave, domiciled in Kentucky, is allowed by consent of his master tó step upon the soil a.nd breathe the atmosphere of Ohio, he becomes a free man, and that,, being once free, his status as a slave can not re-attach to him, even although he may return voluntarily and without delay to the service of his master. There is nothing in the physical properties of either the soil or the atmosphere of Ohio which can have any such effect on the civil state and condition of the person. If any such result follows when a slave comes within the territory of Ohio, it ia by the operation of law, and not that of the soil or the atmosphere; *696 and it will not be controverted, that if a slave, by permission of his master, remove from Kentucky to Ohio, with a view of making this .state the place of his home, from the time he comes within the territorial limits of this state ho becomes free; and being thus once free by the laws of domicile which fix his status, he does not afterward become a slave by a return to Kentucky. And this is in accordance with the law of Kentucky, as settled in the case of Rankin v. Lydia, 2 A. K. Marshall, 468. The effect of this decision is nothing more than that Lydia became free by a change of domicile, effected by a removal with her master from Kentucky to the Territory of Indiana; and that the prohibitory clause of the ordinance of 1787, for the government of the territory northwest of the Ohio river, applied to residents alone, and not to sojourners or travelers. The rule that a slave becomes free upon his first landing in a state or country where slavery is prohibited, applies only to cases of removal of residence and change of domicile, and has no application whatever to cases of 696] *sojourners or travelers; otherwise, it can not be maintained either upon principle or authority, and would contravene a well-settled principle of international jurisprudence. I am aware that the laws of France have been’referred to as at variance with this; but that arises upon a special provision in an edict of Louis XIY., termed “Le Code Noir,” expressly applicable to sojourners and travelers within the kingdom; and also an edict of Louis XY., published in 1716, concerning slavery in the colonies, whereby, under a series of minute regulations, negro slaves were allowed to be brought to France, and continued in slavery, and compelled to return to their place of domicile under the direction of their masters; ■and wherein it was expressly provided, that in case the owners should neglect a strict compliance with the prescribed regulations, the negroes should become free, and their owners lose their property therein. 20 How. St. Tr. 15, note.
The decisions of the Supreme Court of Louisiana have been referred to as sustaining this special provision, as to sojourners, in the law of France, as a general principle of law; but with all due defer■ence, I must be allowed to say that the Louisiana decisions do not go to any such extent.
The most that can be claimed from the casé of Marie Louise v. Marot, 9 Louisiana, 475, is, that a temporary residence of a slave in a free country, for an indefinite space of time, by consent of the •owner, operated to free the slave. .And in this case, it does not ap *697, 698 pear that the intention to return existed at the time of the arrival in France.
Louis v. Cabarrus, 7 Louisiana, is simply to the effect that a residence of a slave in a free state during two or three years, if with the consent of the owner, works his freedom; but otherwise, if without the consent of his master. This rests on the principle of a ■change of domicile.
The case of Priscilla v. Smith, 13 Louisiana, 444, is placed by the *court on the same ground with Marie Louise v. Marot, and [697 of Lumsford v. Coquillon, both of which are cases of residence in a free country by consent of the owner; and although sent back, it does not appear that the intention of returning existed at the time of going into the free country.
In Frank v. Powell, 11 La. 500, the slave had been brought by his master to Ohio, and hired out to an innkeeper, on an under - •standing, that as soon as his wages should produce $150 to the per.son hiring him, he should be free. This was a change of domicile, by consent of the master. The court, in this case, notice the case of Lumsford v. Coquillon, 2 Martin (N. S.), 501, as standing on the same principle, which is, that “ it is from the intention of the owner to remove and reside with his slave, that the emancipation results immediately on such removal.”
In the case of Elizabeth Thomas v. Generis, 16 La. 486, the slave had been taken by the owner to the State of Illinois, in November, 1833, where she resided, by the consent of the owner, till February, 1837 ; and it does not' appear whether the intention of returning existed or not. The court, in this case, reviews its former decisions on this question, including the case of Mario Louise, and places them all on the ground of a residence in a free' state, with the consent of the owner. None of the Louisiana cases go so far as to hold, that if a slave be merely sent into a free state, on an errand, ■or be there, in itinere, by the consent of the owner, that it operates to produce his freedom.
In the case of the Com. v. Aves, 18 Pick. 193, which was he case ■ of a temporary residence in Massachusetts, for some months, of a ■ person with a slave, from Louisiana, the Supreme Court of Massachusetts, expressly waiving the question as to the effect of the laws of that state on a slave passing through, or properly coming into the state, *on business, make the doctrine, that “ a slave [698 brought voluntarily and unnecessarily within the limits of the state,” *699 becomes free, to depend on the fact, whether the' slave chooses to avail himself of the provisions of the laws of that state."
The case of Com. v. Taylor, 3 Met. 72, is substantially to the same effect.
In the case of Nancy Jackson v. Bulloch, 12 Conn. 39, it appeared that Nancy, who was born in the State of Georgia, in the year 1813, and the slave of the defendant, according to the laws of that state, was, in June, 1835, brought by the defendant, with his family, into the State of Connecticut, for the purpose of a temporary residence, the master intending at a future indefinite period, to return with her and his family to the State of Georgia; that Nancy continued in his service, with his family, from June, 1835, until June, 1837, the time of the issue of the writ; and that the defendant, in the meantime, returned to his residence in Georgia twice, spending several months there, each time leaving Nancy with his family in Connecticut. Under this state of facts, it was held, by a majority of the court (three judges against two), that Nancy became free, by the operation of the special provision of a statute of Connecticut, prohibiting the bringing of any negro or mulatto slave into the state, “to be disposed of, left, or sold within the state."
This was the case of a temporary residence, for an indefinite period ; but the court place the decision on the ground that the case came within the express terms of a special statute. The right of transit, however, through Connecticut, by a citizen of another state, with his slave, is expressly admitted in the opinion of the court, in this case. And it is worthy of remark, here, that the court, in this case, was unanimous in the opinion that the provision of the con-699] ■ stitution of that state, declaring that all men were * “ equal in their rights, and that no man, or set of men, are entitled to exclusive public emoluments or privileges from the community,” had evident reference, solely and alone, to those who were parties to the social compact formed or constituted by the constiution ; and that slaves could not be said to be parties to that compact, or to be represented in it. And the following is added, in which, it appears, the court was unanimous:
“ So, too, when, by another article in the constitution, all colored persons are excluded from the privileges of electors, it would seem as if all such persons were considered as excluded from the social compact.
“ The 8th section of the bill of rights has also been pressed upon *700 ns, that1 the people shall be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures.’ This is almost a transcript of the 4th article of the amendments of the constitution of the United States. And the fact that this amendment was adopted at all, and that, amid all the conflict of opinions-upon the subject of slavery, this clause has never been claimed to affect that subject, shows very strongly that it was not intended to apply to that description of persons. When the preamble to the consti■stitution of the United States speaks of ‘ we, the people, to secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution,’ it can not be seriously contended that it included that class of people called slaves; and the term people, in the bill of rights (in Connecticut), must have been used-in a similar sense. The 8th section of the bill of rights, then, can not be intended to include slaves.” Opinion of the court by Chief Justice Williams, 12 Conn. 43.
These decisions, in Massachusetts and Connecticut, referred to, are to the effect only that non-residents or transient persons can not introduce negro slavery into those states, and maintain it there, even temporarily. In neither of these cases is the right of transit of a citizen of another state, with his slave, through Massachusetts or Connecticut, denied; in neither of them is it pretended that the mere landing of a slave on the soil of one of those states, by the consent of his master, effects, absolutely and forever, his emancipation ; and that his voluntary return to servitude *in the place [700 of his domicile would not leave his status as a slave without change. On the contrary, the reasonings of the courts in those cases dis-' tinctly concede the continuance of the status of a slave in case of voluntary return; and also concede that legal rights arising out of the relation of master and slave, and existing in a state where .slavery is authorized, may be recognized and enforced in Massa-. chusetts or Connecticut. The effect of these adjudications, therefore, is most clearly and distinctly against the position taken by the majority of the court in the case before us, which is nothing more nor less than this, that the undeniable legal status of Poindexter in Kentucky, the place both of his domicile and of the contract, can not be even recognized by the courts of Ohio, in a suit upon the contract in this state. Because Poindexter came within the territory of Ohio, and performed a single act of voluntary service, although without claiming his freedom, he voluntarily returned the same day to his home in Kentucky, he is declared by a court in Ohio to have been actually a freeman in Kentucky, in defiance of the constitution *701 and laws of Kentucky.. The question is, not what Poindexter was. while in Ohio, or what his condition might have been, had he remained in this state and claimed his freedom, but the question isr as to the mere recognition of his true legal status in Kentucky at the time of the making of the contract; and it is argued that we can not even recognize the actual legal status of Poindexter in Kentucky, undeniably the place of his domicile, as well as the place of the contract, without abrogating a part of the constitution of Ohio in order to give the slave code of Kentucky an operation within this-state. Thus, under the fallacious idea of guarding against the operation of the laws of Kentucky within the territory of Ohio, actually making the constitution of Ohio operate in Kentucky, not 701] only to regulate *the lex loci contractus within that state, but also to change the fixed status of a person at the place of his domicile in that state. Such an argument need but be stated, not answered.
It has been conceded that a note given for the purchase of a slave-in Kentucky maybe enforced in Ohio; but it is said that stands upon the ground that the lex loci contractus must govern in matters, of contract. T inquire what is the ground of controversy in the case before us but a contract — a subject-matter of the lex loci contractus? It is incoutestible that the lex loci controls as to the.status of the parties to a contract, as well as its subject-matter. And in this case the actual status of Poindexter in Kentucky was, in fact, the subject-matter of the contract itself.
With all due deference, I must be allowed to say, and I say it. without fear of contradiction, that no adjudicated case can be found, either in the United States or in England, which sustains the position upon which the decision of this case is placed.
Groat force is given to an express prohibition of slavery. It is-said that it “strikes down and destroys; ” and can not give way to-the local laws of another state. Now, a local law of another state can have no extra-territorial operation at all events; and in that respect the prohibition can be of no effect. The prohibition in our constitution absolutely prevents all slavery or involuntary servitude-within the territory of Ohio. But it does not operate beyond the-limits of this state. It can not affect the condition of the negro in Kentucky. It is operative on the condition and servitude of persons iii' Ohio. It is not a prohibition against the recognition of legal' rights in another state. And it can have no operation whatever upon, *702, 703 questions of comity, relating to matters beyond the sphere of its operation.
It is also argued, as a matter supposed to be most conclusive and ^unanswerable, that if a man can-be a slave in Ohio for an [70S hour or a day, that he may be such for a month or a year, and that thus slavery may exist in this state in defiance of the constitution. This .argument is founded on the false assumption that it is claimed that slavery can exist in Ohio at all. I insist that a man can not be a slave in Ohio at all — that is, he can not be held to the performance of involuntary service in this state for one moment. If a man who is a slave in Kentucky comes into Ohio for a mere temporary purpose, intending to return, although not subject to involuntary service in Ohio, he still continues a slave in the state to which he belongs. It is true, if he be allowed to change his domicile and remove his home to Ohio, he becomes a free man. But if his home be in Kem tucky, and. he be in Ohio a mere traveler or sojourner, he is not a slave in Ohio, because not subject to involuntary service here, but ho is still a slave in Kentucky, because he is legally liable to servitude there as soon as he X'eturns. The mere recognition in Ohio of a legal right existing in Kentucky, is not slavery in Ohio. And there is no law making it a forfeiture of the legal right of the master to permit his slave to come into this state for a temporary purpose. The ax’gument mentioned, therefore, is a baseless fabric, when the false assumption is exposed.
To maintain the ground upon which the decision of this case is based, it is essential that each one of the following distinct propositions be established:
1. That as soon as a slave, by the permission of its master, enters the territory of a state or country where slavery is prohibited, even for a mere temporaxy purpose, or in transitu, intending to retuxm, he becomes absolutely and forever free.
2. That if a slave thus go into a free state without a change of domicile, and thus become free, his immediate *and volun- [703 tary return to his. domicile, without claiming his freedom, can not reinstate his status as'a slave; and,
3. That after such return, although he may actually and in fact, be a slave according to the laws of the place of his domicile, yet that his true status as such, can not afterward be recognized in the courts of Ohio, even in matters subject to the lex loci contractus.
It is asserted, without qualification, that the law has been so well *704 settled in Ohio as never to have been questioned, that a slave coming, at any time, by the consent of his master, even for a temporary purpose, within the territory of Ohio, becomes at once absolutely and forever free. This opinion must strike the greater part of the legal profession, in this state, with surprise. How could such a doctrine have been so well settled, and have prevailed without question, against the repeated decisions of the courts in adjoining states, and of the Supreme Court of the United States, from time to time, to the contrary, in reference to slaves coming, for temporary purposes, into Ohio, Indiana, and Illinois. Until recently, the right of transit of a master with his slave, in traveling through Ohio, was not questioned. In the intercourse' of the people of Ohio with the people of Kentucky and Virginia, since the organization of the state government, it has been a very common occurrence for a slave to be sent into this state on an errand, or to pass through the state on a journey with his master ;_and the acquiescence in this common practice most manifestly negatives the prevalence of any such well settled and well known rule in Ohio, as that mentioned. After the lapse of over half a century, the case before us is the first reported adjudication in Ohio, to announce and give judicial sanction to a doctrine, on this subject, contrary to the rule of law as settled in the other states, and by the repeated decisions of the Supreme Court 704] of the United States. But this case *has the especial distinction of being the pioneer case, in the Supreme Court of Ohio, in giving judicial sanction, not simply to the idea that the moment a slave, for a mere temporary purpose, or in itinere, stepped upon the soil and breathed the atmosphere of Ohio, he became free, absolutely and forever, but in promulgating a doctrine never before judicially declared, either in this country or in England, which is, that although the slave coming on the soil of Ohio," should choose not to claim his freedom, but to return voluntarily and without delay to the service of his master, at the place of his domicile in another state, yet that nolens volens he was a free man, by the magical operation of the constitution of Ohio adhering to him, and following him to the place of his domicile, in defiance to the constitution and laws of the state to which he belongs.
In the case of Lewis v. Fullerton, 1 Rand. 15, it was held by the court of appeals in Virginia, that a slave going from Virginia to Ohio, with the consent of his master, for a mere transitory purpose, and with the animus revertendi, does not thereby acquire a right to' *705 freedom in Virginia; nor is such right established by a judgment on a habeas corpus, in Ohio, in favor of the slave.
And in the case of Willard v. The People, 4 Scam. 461, it was held, by the Supreme Court of Illinois, that a slave does not, by the constitution of that state, which prohibits slavery, become free by going into the state for the mere purpose of passing through it; and that such going into the state is not an introduction of slavery therein.
The doctrine of this last case is precisely in point, and directly sustains my position; and that, too, in a state where there is an express constitutional prohibition against slavery. If, however, the absence of all positive law to support the relation of master and slave, annihilates it, and *sets the slave free at once, I do not [705 perceive how an express prohibition can do more.
There is a mistake in the assertion, that the authorities which I have cited, come from states in which slavery is either authorized, or not expressly forbidden. The Supreme Court of Massachusetts, in the case of the negro Aves, 18 Pick., say, that slavery was abolished in that state, by their express constitutional provision, declaring all men free; and the Supreme Court of Connecticut, in the case of Jackson v. Bullock, went on the ground of an express statute excluding slavery, and certainly, the remark will not apply to the case cited from Illinois.
It is also said, that Mr. Justice Story has said, in his “ Conflict of Laws,” that slavery will not be recognized in any country whose institutions and policy prohibit slavery. This remark of Judge Story, is not sustained by authority, and is irreconcilable with the decision of the case of the Antelope, 10 Wheat., in which he concurred; and inconsistent with the doctrine of Ch. J. Shaw, in the case of Aves, 18 Pick., which Judge Story has quoted, at full length, and with approbation, in a note in a late edition of his “ Conflict of Laws.”
The law as settled in England has been referred to with groat confidence, as authority to sustain the positions assumed in this case. And the case of the negro James Sommorsett, 20 Howell’s St. Trials, 20 has been cited as the leading case settling the laws of that country, in this respect.
That was the case of a. negro brought before the court of king’s bench, on a writ of habeas corpus, in December, 1771. The return showed, that Sommersett had been a negro slave in Africa, and as such, in the course of the trade carried on by his majesty’s subjects, *706, 707 between Africa and his majesty’s colonies of Virginia, Jamaica, etc., 706] in * America, was brought to the colony of Virginia, and' •there sold as a slave, under the authority of law, to Charles Steuart, Esq., then an inhabitant of Yirginia, and whose negro slave and! property he was still claimed to be; that said Steuart, in November, 1769, came on business to England, bringing Sommersett with him to attend him as his servant, with an intention of returning, taking the slave back with him to America, as soon as his affairs and business in England should be transacted; but that his affairs and business-in that kingdom wore not yet transacted, and that his intention to return to America still continued ; that Sommersett had continued to attend and serve said Steuart in England, from the time of his arrival in that kingdom, until October, 1771 (a period of about two years), when he departed from his service, and refused to return to serve him longer; whoreujwn said Steuart, on the 26th day of November, 1771, delivered Sommersett confined in irons, to John Knowles, on board a ship called the Ann and Mary, lying in the Thames, and bound for Jamaica (whose master and commander said Knowles was), to 'be by him kept and conveyed in said ship, on. its then voyage to Jamaica, for the purpose of being there sold as the slave and property of said Steuart.
Several things are to be especially noted in regard to this case.
1. That the writ of habeas corpus was directed, not to Steuart who claimed to own the slave, but to Captain Knowles, who held the negro in close confinement, for the purpose of taking Mm abroad to Jamaica to be sold as a slave in that country; that the case was decided on the special circumstances set up in the return of Knowles to.the writ; and that the direct question involved was, not whether the negro could be compelled to serve Steuart in England, or 707] whether Steuart could coerce him to go back to Yirginia, *his place of domicile, before ho came to England, but whether Knowles could legally hold him under Steuart’s authority, for the, purpose of taking him abroad to another country, there to be sold as a slave.
2. Lord Mansfield, in deciding the case on the special circumstances set out in the return, said: “ The only question before us is, whether the cause on the return is sufficient f If it is, the negro must be remanded; if it is not, he must be discharged. Accordingly, the return states that the slave departed and refused to serve; whereupon he was kept to be sold abroad. So high an act of dominion must be recognised by the law of the country where it -is used,” etc. *708 And after some general remarks, touching the diversity in the powers of the master over his slave in different countries; an'd as. to the odious character of slavery being such that it can only be ■ supported by positive law; Lord Mansfield adds: “ "Whatever inconveniences, therefore, may follow from the decision, I can not say this ease is allowed or approved by the law of England; and therefore the black must be discharged.”
3. It is not to be overlooked that Steuart was staying in England for an indefinite period 'of time, and although he had been there for about two years before the negro refused longer to serve him, yet it was still uncertain how much longer he was about to remain; and also that he was not proposing to send the negro back to Yirginia as his place of domicile, but to 'send him abroad to another country, Jamaica, to be sold. The intention of returning the negro to. Yirginia having been finally abandoned, here was a clear case of 'absolute change of domicile. Lord Mansfield is erroneously reported as saying thatEteuart had purchased the negro in Jamaica. It was. in Yirginia where Steuart had previously resided and where he had purchased the negro, as ajDpears from the return to the writ, and *Mr. Hargrave’s statement of the case in his argument. [70S
4. After the argument of the case Lord Mansfield expresses some hesitation in the decision of the case; suggests a compromise; and also an application to Parliament as “ the best, and, perhaps, the only method of settling the point for the future; states that the question is whether “ the owner had a right to detain the slave for the sending• him over to be soldin Jamaica; ” and again, that the now question is, whether the same dominion, authority, or coercion can be exercised in England over a slave which is authorized by the American laws; remarks that “ contract for the sale of a slave is good in England,” etc., but that, in this case, “ the person of a slave himself is the object of inquiry; ” and finally, adjourns the case over till the next, term for decision,
5. In deciding the case finally, on the special ground whether the dominion could be exercised over the slave, to send him abroad to be sold, he is particular to qualify the decision by saying, “ "We-pay all due attention to the opinion of Sir Philip Yorke and Lord. Chancellor Talbot, whereby they pledged themselves to the British planters for all the legal consequences of slaves coming over to this kingdom, or being baptized, recognized by Lord Hardwicke, sitting-as chancellor, on the 19th of October, 1749, that trover would lie;. *709, 710 that a notion had prevailed if a negro came over, or became a ' Christian, he was emancipated, but no ground in law; that he and Lord Talbot, when attorney and solicitor general, were of opinion that no such claim for freedom was valid,” etc.; and that he did not conceive but that a man might become a “ villein in gross,” etc.
That some errors have prevailed in regard to the true legal effect ■ of the opinion of Lord Mansfield in this case, is most manifest. He 709] used no such expression as that a *slave became free the moment he landed in England; it is true, he said, that slavery was ■odious, and could only be supported by “positive law.” But what ■was meant by positive law has not always been accurately undcr- ■ stood. Mr. Curtis (now Mr. Justice Curtis of the Supreme Court of the United States), in his argument in the case of Aves, 18 Pick. 199, said: “ If by positive law is meant a law enacted by the legislative power of the country, the assertion is not true, in ,point of fact; for in all modern states, with the exception of some of the •colonies of Spain, slavery has been introduced by custom, andwith- • out any action of the legislative power; ” and Chief Justice Shaw, in the same case, on page 212, adds, “ that by positive law, in this •connection, may be as well understood customary law as the enactment of a statute; and the word is used to designate rules established by tacit acquiescence, or by the legislative act of state, and which derive their foree and authority from such acquiescence or ■ enactment^ and not because they are the dictates of natural justice, .and as much of universal obligation.”
It is true the general remarks of Lord Mansfield are against the legal existence of negro slavery in England. But it is here to be particularly noticed, that the questions, how far legal rights, arising out of the relation of master and slave in the colonies, would be recognized and enforced in regard to persons domiciled in the •colonies, and merely sojourning in England, and whether the status ■of a slave, after a sojourn in England, was reinstated by his return to his domicile in the colonies, do not appear to have been particularly considered in the Sommersett case, and-Lord Mansfield expresses no definite oirinion upon either, except so far as may be gathered from his opinion, that contracts made in England, for the sale of 719] negro slaves, would be obligatory, and that he recognized *the law as expressed by Lord Chancellor Talbot, and Lord Hardwicke, in regard to slaves coming over to the kingdom from the colonies *711 and becoming baptized, and that a man might still occupy the condition a villein in gross in England.
While it is to be regretted, that the report of Lord Mansfield’s' opinion had not been more full and explicit, it is very certain there is nothing in it which sustains the doctrine upon which the decision of the case before us is placed.
The high authority of Sir William Blaekstone has been appealed to, whose Commentaries were, before publication, submitted to the supervision of Lord Mansfield, at a period not distant from the time of the decision in the Sommersett case. But the authority of this standard Commentator, fully considered, utterly fails to support the position assumed in this ease. While he recognizes the-law of domicile in England, in language similar to that of Lord Mansfield in the Sommersett case, ho expressly recognizes the right, of the master to the service of his slave, even under the laws of England, while the relation of master and servant continues, in the ■ following language:
“ It is laid down that a slave or negro, the instant he lands in England, becomes a freeman; that is, the law will protect him in the enjoyment of his person and his property. Yet, with regard to-any right which the master may have lawfully acquired to the perpetual service of John or Thomas, this will remain in exactly the same state as before; for this is no more than the same state of subjection for life which every apprentice submits to for the space of seven years, or sometimes for a longer term. Hence, too, it follows, that the infamous and unchristian practice of withholding baptism from negro servants, lest they should thereby gain their liberty, is.totally without foundation, as well as without excuse. The law of England acts upon general and extensive principles; it gives liberty, rightly understood, that is, protection, to a Jew, a Turk, or a heathen,, as well as to those who profess the true religion of Cnrist; and it will not dissolve a civil obligation between master and servant, on account of the alteration of faith in either of the parties, but the *slave is entitled to the same protection in England, before, [711 as after baptism ; and whatever service the heathen negro owed of' right to his American master by general, not by local law, the same (whatever it be) is he bound to render when brought to England and made a Christian.” 1 Wend. Blackstone, 424.
The right of the master to the services of his slave, even in England, so distinctly stated here by Blaekstone, is consistent with the - language of qualification used by Lord Mansfield in his opinion in. the Sommersett case.
*712 Blackstone explains what is meant by the often-repeated expression, “that slavery can not subsist in England;” and that “ the in•.stant a slave or negro lands in England he becomes a freeman.” He says, on page 423 (1 Wend. Bla.), “I have formerly observed that pure and proper slavery does not, nay, can not, subsist in England; such, I mean, whereby an absolute and unlimited power is given to the master over the life and fortune of the slave.” And on page 424 he adds : “ And now it is laid down that a slave or negro, the instant he lands in England, becomes a freeman; that is, the law will protect him in the enjoyment of his person and his property. Yet, with regard to any right which the master may have lawfully acquired to the perpetual service of the negro, this will remain in exactly the same state as before;" etc. “And whatever service the heathen negro owed of right to his American master by general, not by local law,- the same (whatever it be) is he bound to render when 'brought to England and made a Christian.”
It is manifest that the slavery which was repudiated in England, was that form of it which conceded to the master absolute and unlimited power over the person and the life of the slave; and other odious ■incidents to the power of the master, supported only by local law, and understood at that age to be peculiar to negro slavery. This is 712] what Blackstone ^termed 11 pure and proper slavery.” _ And the insrant a negro landed in England, the lavr protected him in his person, and he became freed from any inhuman dominion over his life or person; but still he might be held to “ perpetual service,” under the relation of master and servant, as it was recognized in England. Slavery in some countries gives the master absolute control over the life and person of the slave. This was understood to be the case with slavery in Africa, and to some extent to be incident to negro slavery in the American colonies in 1771. Lord Mansfield, in the Sommersett case, in reference to slavery “ according to the American laws,” speaks of “ the difiiculty of adopting the relation without adopting it in all its consequences,” many of which were “ contrary to the municipal law of England.” Yet, in deciding the Sommersett case on the special circumstances stated in the return to the writ, he recognizes the doctrine of Talbot and .Hardwicke as to negro slavery, and adds, in connection therewith, ■“that though the statute of tenures had abolished villeins regard-,-ant to a manor, yet he did not conceive but that a man might still '¡become a villein in gross,” etc. Now, villeinage in gross, as it ex *713 isted in England, did not differ very essentially in its legal inci-dents from negro slavery as it exists in Kentucky. Although tho master had no power over.the life of the villein, or right to maim, -or to use brutal’ violence upon his person, yet he had absolute control over his person for the purpose of his services for life, and this extended to his issue; and the villein was salable and transmissible ■from one master to another. Villeins regardant were chattels real, sand were sold with the land. But villeins in gross were transferable as simple chattels.
In the case of Smith v. Brown et al., 2 Salk. 666, which was an indebitatus assumpsit for the price of a negro *sold by plaintiff [713 to defendant, “Holt, C. J., held that as soon as a negro comes to England he becomes free. One may be a villein in England, but not a slave." And Powell, J., added: “ In a villein the owner has a property, but it is an inheritance; in a word, he has a property, but it is a chattel-real, the law took no notice of a negro.”
It is manifest, from the language of Lord Chief Justice Holt, as well as that of Blackstone, and others, that the servitude of villeins in gross, and that kind of perpetual servitude, which did not give the master absolute dominion over the life and person of the servant, was not slavery in their understanding of the term; and that the slavery which they said could not subsist in England, was that which Blackstone terms u pure and proper slavery."
The case of Butts v. Perry (decided in 28 Charles II., 2 Lev. 201, and 3 Keb. 785), was trover for ten negroes, in which it was held, that negroes being usually bought and sold among merchants in India, and being infidels, there might be a property in them sufficient to sustain the action.
In Jelly v. Clive, which was trover for a negro and certain articles of merchandise (decided in 5 William and Mary, 1 L. Raym. 147), it was held that trover would lie for a negro, because negroes are heathen.
In the case of Pearne v. Lisle, decided in 1749 (1 Ambler, 75), Lord Hardwicke, holding that trover would lie for a negro slave, said:
“I have no doubt but trover.will lie for a negro slave; it is as much property as any other thing. The cáse in Salk. 666, was determined on a want of proper description. It was trover pro uno JEthiope vocat. Negro without saying-slave; and the being negro did not necessarily imply slave. The reason said at the bar to *714, 715 have been given by Lord Chief Justice Holt, in that case, as thecauso of his doubts, viz., that the moment a slave sets foot in England ho becomes free, has no weight with it, nor can any reason be found, why they should not be equally so when they set foot in 714] Jamaica, or *any other English plantation. All our colonies are subject to the laws of England, although, as to some purposes, they have laws of their own. There was once a doubt, whether, if they were christened, they would not become free by that act, and there were precautions taken in the colonies to prevent their being-baptized, till the opinion of Lord Talbot, and myself, then attorney and solicitor-general, was taken on that point. We were both of opinion, that it did not at all alter their state.”
I do not understand Lord Mansfield, in the Sommersett case, to-attempt to review and overrule prior adjudications. On the contrary, he recognizes the doctrine of Talbot and Hardwicke, and justifies it by the existing authority for villeinage in gross. And it is idle to attempt to explain the right of the master to “ the perpetual servitude ” of the slave, as recognized by Blackstone, on the ground of contract. It is argued, that the position of Blackstone was overruled by the decision of the Sommersett case. This can not be so, for there is no actual inconsistency in views expressed by Blackstone and Lord Mansfield’s opinion. Had the Sommersett case been understood as overruling Blackstono’s position, a correction would doubtless have been made in the very next edition of the Commentaries. It is said that my view of the Sommersett caséis new. This may be so, to those who have not fully examined the case. I let the report of the case speak for itself; and for this purpose, the opinion of Lord Mansfield, and the return to the habeas corpus, are given in full, at the close of this opinion, in a note. It is said that the ordinance of 1787, for the government of the northwestern territory, and the constitution of Ohio, of 1802, were framed with a view to the decision of the Sommersett case, and in accordance therewith. This I most respectfully controvert. The prohibitory clauses, in these instruments, stand upon altogether; higher ground. They did not' leave authority to buy and sell, or traffic in slaves within Ohio, which Lord Mansfield expressly recognized by 715] conceding the validity of *such contracts made in England ; and they did not recognize or sanction slavery, in the modified form of villeinage in gross.
I have examined at some length these English authorities, not for the purpose of sustaining my own position, but for the pui'pose of *716 correcting some misapprehensions, and showing that they do not sustain the position taken by the majority of the court, as has been supposed.
In the celebrated case of the slave Grace, 2 Hagg. Adm. 94, Lord Stowell holding, that upon the return of a slave to his original domicile, from a country by whose laws he was declared free, the state of slavery would re-attach to him, said : “ The entire change of the legal character of individuals, produced by the. change of local situation, is far from being a novelty in law. A residence in a new country often introduces a change of legal condition, which imposes rights and obligations totally inconsistent with the former rights and obligations oí the same persons. Persons bound by particular contracts, which restrain their liberty — debtors, apprentices, and others, lose their character and condition for the time, when they reside in another country, and are entitled, as persons totally free, although they return to their original servitude and obligations, upon their coming back to the country they had quitted, and even in the case of slavery, slaves themselves possess rights and privileges in one character, which they are not entitled to in another. The domestic slave may, in that character, by law, accompany his master or mistress to any part of the world. But that privilege exists no longer than his character of domestic slave attaches to him ; for, should the owner deprive him of the character of being a domestic slave, by employing him as a field slave, he would be deprived of the right of accompanying his master out of the colony.”
It appears that after the decision of this case, Lord Stowell wrote *to Judge Story, inclosing to him a copy of his opinion in [716 the case; and that Story, in his reply, of the date of 22d September, 1828, said:
“If I had been called upon to pronounce a judgment in a like case, I should certainly have arrived at the same result, though I might not have been able to present the reasons which lead to it in such a striking and convincing manner. It appears to me that the opinion is impregnable.
“ In my native state (Massachusetts), the state of slavery is not recognized as legal; yet, if a slave should come hither, and afterward return to his own home, we should certainly think that the local laws would re-attach upon him, and that his servile character would be reintegrated. I have had occasion to know that your judgment has been extensively read in America (where questions of this nature are not of unfrequent discussion), and I never have heard any other opin *717 ion but that of approbation of it expressed among the profession of the law.” 1 Life and Letters of Story, 558.
After speaking of the question of a slave becoming free, on his removal to a country where slavery is not allowed, Judge Story, in his work on Conflict of Laws, says (sec. 96): " It is quite a differ■ent question, how far rights acquired, and wrongs done slave property, or contracts made respecting such property, in countries where ¡slavery is permitted, may be allowed to be redressed, or recognized in the judicial tribunals of government, which prohibit slavery.”
The case of Madrazo v. Willes, decided in 1820, and reported in 5 Eng. C. L. 313, was an action brought by a subject of Spain against a British subject, who had unlawfully captured a ship with three hundred slaves on board. A question having been raised at the trial before the lord chief justice, whether the plaintiff was entitled to recover the value of the slaves in an English court of justice, since the slave trade, and all dealings connected with it, had been declared, by the British statutes, unlawful and contrary to the principles of justice, humanity, and sound policy,“the jury was 717] directed to find their verdict ^separately for each part of the -damage, so as to give the defendant an opportunity of testing his question, by motion after verdict. Accordingly, the jury found for the plaintiff, assessing his damages at £21,180; consisting of £3,000 .for deterioration of ships, stores, and goods, and £18,180 for the supposed profit of the cargo of slaves. On motion to reduce the dam.ages to the extent of the assessment for the cargo of slaves, the ■court, by a unanimous decision, held, that as the slave trade was not condemned by the general law of nations, a foreigner who is not prohibited from carrying on the slave trade by the laws of his •own country, may, in a British court of justice, recover damages •.sustained by him in respect of the wrongful seizure, by a British .¡subject, of a cargo of slaves on board of a ship then employed by .him in carrying on the African slave trade.
It has been said that the case of Forbes v. Cochrane, 2 Barn. & Cress. 448, is in conflict with the ease last cited, and to the effect that whenever a slave, in any manner, gets beyond the limits where the local law authorizing his servitude operates, he becomes free. But whatever may have been the obiter dicta of the judges in this •case, it decided nothing more than that an .action would not lie .against the master of a ship for harboring slaves, who had escaped ' *718 -from their master in Florida and got on board the ship, the owner being allowed to use persuasive but not coercive means to take the ■slaves off the ship.
The case of The Diana, 1 Dodson, 95, sustains the general principles that, although the slave trade is condemned in the English courts as contrary to the principles of justice and humanity, yet, as it can not with truth be said to be contrary to international law, courts must respect the property of persons engaged in it under the sanction of the laws of their own country. To the same effect are *the cases of Le Louis, 2 Dodson, 236, and The Amedie, [718 1 Acton, 240.
The same doctrine is declared by the Supreme Court of the United States, in the able opinion of Chief Justice Marshall, in the case of the Antelope, 10 Wheat. 120; the effect of which is, that although slavery and the slave trade are deemed contrary to natural right, yet it is settled, by the judicial decisions both of this country and of England, that they are not contrary to the laws of nations.
The result of this doctrine is, that each independent community, in its intercourse with every other, is bound to act on the principio that such other country has complete authority to make such laws for the government of its own subjects as its own judgment shall dictate, provided the same be consistent with the laws of nations; and that each sovereign state, although governed by its own laws, and competent to make such laws as it may deem expedient for the government of its own subjects, has no authority to enforce it own laws beyond its own territorial limits, or over those who are not its subjects, or to treat the laws of other states, or rights acquired under the laws of other states not consistent with the laws ■of nations, as void, although contrary to its own views of morality.
The following remarks of Chief Justice Shaw, in delivering the opinion of the court in the case of Commonwealth v. Aves, 18 Pick., above cited, are in point, and fully sustain my position:
“ Upon a general review of the authorities, and upon an application of the well-established principles upon this subject, we think they fully maintain the point stated, that though slavery is contrary to natural right, to the principles of justice, humanity, and sound policy, as we adopt them, and found our own laws upon them, yet, not being contrary to the law of nations, if any other state or community see fit to establish and continue slavery by law, so far as the legislative power of the country extends, we are bound to take notice *719, 720 719] *of the existence of those laws, and we are not at liberty to declare and hold ah act done within those limits unlawful and void, upon our views of morality and policy, which the sovereign and legislative power of the place has pronounced to be- lawful.
“ If, therefore, an unwarranted interference and wrong is done by our citizens to a foreigner, acting under the sanction of such laws, and within their proper limits, that is, within the local limits of the-power by whom they are thus established, or on the high seas, which each and every nation has a right in common with all others to occupy, our laws would no doubt afford a remedy against the wrong done. So in pursuance of a well-known maxim, that in the construction of contracts, the lex loci contractus shall govern, if a. person, having in other respects a right to sue in our courts, shall bring an action against, another, liable in other respects to be sued in our courts, upon a contract made ujDon the subject of slavery, in a state whore slavery is allowed by law, the law here would give it. effect. As if a note of hand, made in New Orleans, were sued on here, and the defense should be, that it was on a bad consideration, or without consideration, because given for the price of a slave sold, it may well be admitted that such a defense could not prevail, because the contract' was a legal one by the law of the place where it. was made.”
Negro slavery has been spoken of, in this case, repeatedly, as property in human beings — as creating a relation assimilated to the-relation of th.e owner to his domestic animals, etc. "What is meant, by property in men so often repeated ? Does it mean a property in the flesh and blood of the slave ? Does it mean that a master, in Kentucky, has dominion over the life of his slave, and may kill him and eat him, as he does his ox ? Does it mean that a master has a, right to treat his slave with brutal violence ? If so, it is what is-termed ad captandum logic, and is without foundation in fact. The property of the master in his slave in Kentucky consists in the right of the former to the services of the latter, and control over •him for that purpose only, and not a property in his flesh and blood. The laws of Kentucky recognize the negro slave as a man, and protect his person as a human being, while they hold him to be property as to the purpose of his master.' While the relation of employer 720] and employed produces a qualified property of the former *in the services of the latter by contract, the relation of master and slave produces a property in the services of the latter by operation of law.
This is not the place to discuss the comparative advantages and .evils incident to these two different systems of labor. Suffice it to say, that however great may be the evils of domestic slavery, the- *721 ■system of labor by voluntary contract is not without its consequent oppressions and sufferings. The scenes of distress from destitution, and mortality from hunger, and want of sufficient clothing and shelter from the inclemencies of the season, to be witnessed among the operatives in the workshops and factories of England, while they may attest the fact, that free labor is cheaper than slave labor to the employer, show that the former is not without its attendant train of human suffering and distress.
I have taken a much wider range in the consideration of the questions brought under review in this case, than I should have ■otherwise done, on account of their frequent occurrence and important bearing upon the harmony and welfare of the country. The real question, however, under discussion must be determined by the laws of Kentucky. Poindexter was not only in Kentucky, but domiciled in Kentucky, at the time the notes were given. And the question is not'whether the laws of Kentucky can operate in Ohio; not whether Poindexter would have been a freeman, had he been in Ohio ; but whether he was at the time, a slave in Kentucky. ‘The judicial tribunals of Ohio can not stand on punctilio, and refuse to recognize an existing legal fact necessarily brought to their consideration. And whether Poindexter was a slave or not depended on the effect of the law of Kentucky, within the limits of that state. And to ascertain what the law of Kentucky was, in this respect, %e are not under the necessity of looking to the laws of Eng- [721 land, or of any other state or country; for it has been fully determined, and explicitly declared, by the judicial tribunals of that state.
In Collins v. America, 9 B. Mon. 565, it was decided that a slave in Kentucky, sent or permitted to go into Ohio for a temporary purpose, where slavery is prohibited, does not thereby acquire a right to assert his freedom in Kentucky; and that on his return from Ohio to the custody of his owner, he could not appeal to the laws of that state for his freedom.
In Maria v. Kirby, 12 B. Mon. 512, it was held that “ though a state may have a right to declare the condition of every person within her limits, the right only exists while that person remains there. She has'not the power of giving a condition or status to a person temporarily within her limits which will adhere to the person everywhere; but upon the return of the person to the place •of his domicile, he will occupy his former position ; if a slave, that of a slave. And that in case of the removal of a slave into a free *722 state temporarily, who returns with or to his owner, the effect upon the status of the slave is to be determined by the law of Kentucky, ( and not that of the state where the slave had been.
I do not understand the courts of Kentucky, as has been intimated, to refuse to recognize the laws of Ohio, as fixing the status of persons domiciled in this state. The decision in the case of Rankin v. Lydia, heretofore cited, shows the contrary. Where, however, a subject of the State of Kentucky comes into Ohio for a mere temporary purpose, they do not recognize that as a change of domicile, or as affecting a change in the status of the person. And this appears to be in accordance with well-settled principles. And with all proper deference I must be permitted to say that I can 722] *not perceive how it can bo fairly said that we must abrogate a part of the constitution of Ohio and introduce the slave code of Kentucky here, in order to recognize the laws of Kentucky as governing the status of a person actually domiciled, both by birth and by choice, in that state. And I have not been able to find the report of a case decided; either in England or in this-country, where it has been held that the status of a person was not to be regarded as being fixed by the laws of the place of his domicile.
Graham v. Strader et al., 5 B. Mon. 173, is a case decided by the-court of appeals in Kentucky in 1844, wherein it was held that the owner of a slave residing in Kentucky does not forfeit his slave by taking him into Indiana or Ohio himself, or permitting another to-do so, where the object of the visit is only temporary — for a few hours of pleasure or amusement, or traveling through the state, and especially where no right to freedom is asserted by the slave while there.
This case was taken to the Supreme Court of the United States, where it was held “ that the laws of Kentucky alone could decide upon the domestic and social condition of the persons domiciled within its territory, except so far as the powers of the states in this-respect are restrained, or duties or obligations imposed upon them by the constitution of the United States, and that the decision of the court of appeals of Kentucky, in this case, was conclusive.”' See Strader v. Graham, 10 How. 83.
These adjudications in Kentucky, sanctioned by that of the Supreme Court of the United States in Strader v. Graham, are in strict accordance with the law as it has been settled in Missouri and a number of the other states ; in accordance with the law as set- *723, 724 tied in England, as-appears from the cases heretofore cited ; in accordance with the *rule recognized by Judge Story in his [723 letter to Lord Stowell; and in accordance with the doctrine settled by the Supreme Court of the United States in the recent elaborately-investigated case of Dred Scott v. Sanford (which has attracted much attention), 19 How. 396. There is no mistaking or mode of avoiding the force of the authority of the decisions of the Supreme Court of the United States on this question. I refer to them not as the decisions of a tribunal exercising appellate power over our judgments, but as the adjudications of a tribunal entitled to the very highest consideration and respect, and moi*e especially on such a question as that before us. The suit pending here might have been instituted in the federal courts. And if the Supreme Court of the United States can constitutionally exercise appellate power over the state courts, in any case, it would be in cases between citizens of different states, and in regard to questions involving th,e peace and harmony of the several states in their intercourse with each other.
At the present term, this court, by a majority opinion, has recognized the binding authority of the adjudications of the Supreme Court of the United States, even to reverse our own judgments, and that, too, on a simple question of local state taxation, á question in nowise connected with the affairs of the federal government, or of the other states of the Union ; the effect of which adjudication, if authoritative, was not only to nullify a state revenue law, but also to abrogate a most salutory and important provision in the constitution of this state, requiring an equal burden of taxation to be imposed on the moneyed institutions of the state. See Piqua Bank v. Knoup, supra. And I must be allowed to say, with all due deference for the opinion of the majority of this court, if in this matter of equal taxation in Ohio, the decisions of the Supreme Court of the United States can *have the binding force and effect of law to us, paramount [724 not only to the statutes, but the constitution of the state, I am wholly unable to perceive, upon what legal ground the decision of that tribunal, upon a question such as that now before us, should not govern us in our judicial action.
It is argued, however, that negro slavery is immoral and criminal in itself, and in contravention of law, both natural and divine; and that, therefore, its legal existence in Kentucky, or rights arising out of it there, are not to be recognized or enforced in this state.
*725 It is not necessary for the purposes of this opinion, to consider the question whether slavery is contrary to the law of nature. That has been a controverted question among casuists and writers on natural láw. Aristotle, Grotius, Hobbs, Puffendorff, Bynkershock, Eutherforth, Paley, and others, treat it as a usual condition which may exist under regulations of' the municipal law; and, although not the natural state of any man, yet that it may be introduced consistently with the law of nature. On the other hand, Montesquieu, Locke, Beattie, Blackstone, and other eminent writers, in reference more especially to the relation of master and servant, “ whereby an absolute and unlimited power is given to the master over the life and fortune of the slave,” condemn slavery as repugnant to reason and the principles of natural law. But however much I may be disposed to yield to the conclusive force of the views of the latter over the former, it is wholly immaterial as it regards the determination of this case.
And it is equally unnecessary, here, to consider the question whether slavery is contrary to the divine law. We do not sit here to administer the divine law. The only theocracy known on the earth was that which was governed by the law given on Mount Sinai, whereby not only was slavery recognized and regulated; but 725] the terms prescribed, on *which a slave, when freed on the day of Jubilee, might be legally reinstated in his condition of servitude together with his wife and children, and required thereafter to serve his master forever. Exodus, ch. 21, v. 4-6. It is not necessary to stop to inquire whether the law delivered to Moses on, Sinai either sanctioned or established a relation contrary to the law of nature, and intrinsically immoral and vicious. It is not necessary here to inquire whether the repeated teachings of the New Testament, of obedience of servants to their masters (Titus, ch. ii., v. 9; 1 Ep. of Peter, ch. ii., v. 18; 1 Timothy, ch. vi.; Collosians, ch. iii., v. 22; Ephesians, ch. 6, v. 5); or whether the act of Paul, in sending the fugitive slave Onesimus back to his master Philemon, was giving a sanction-to, and sustaining an institution sinful and immoral in itself (Paul’s Ep. to Philemon). It is not necessary to inquire whether there is a purer1 and higher morality than the Bible. These are questions for the theologian and the moralist, and upon which I deem it proper to express no opinion whatever here It is sufficient to know that in the judicial determination of a question, there is no higher law to us than the constitution which we- *726 have sworn to support. We are not here to determine questions of •divinity or of caéuistry. In determining how far we may disregard ■.the comity of nations, and refuse to recognize or enforce rights ■arising out of a legal relation in another state, we must look to the legal standard of morality, instead of the conflicting theories of theologians and moralists. It is sufficient for us to know that the relation of master and slave is recognized by the constitution of the United States and sanctioned by the law of nations. This fixes the legal standard of morality for judicial action on such a question .as this. When a similar question was presented to the court of admiralty in England, in reference to the slave trade, in *tho [726 case of the Louis, a French vessel captured on a slaving voyage, the eminent English jurist, Sir William Scott, said: “A court, in the .administration of law, can not impute criminality to an act where the law imputes none. It must look to the legal standard of morality ; and, upon a question of this nature, that standard must be found in the law of nations as fixed and evidenced by general and ancient, and admitted practice, by treaties, and by the general tenor of the laws and ordinances, and the formal transactions of civilized states; and looking to those authorities, he found a difficulty in maintaining that the transaction was legally criminal.” 2 Dodson, 438. And the remarks of Chief Justice Marshall, in reference to the same question in regard to the slave trade, in the ease the Antelope, 10 Wheat. 66, are in point: “Whatever might be the answer of a moralist to this question, a jurist must search for its solution in those principles of action which are sanctioned by the usages, the national acts, and the general assent of that portion of the world of which he considers himself as a part, and to whose law the appeal is made. -If we resort to this standard as the test of international law, the question, as has already been observed, is decided in favor of the legality of the trade. Both Europe and America had embarked in it, and for nearly two centuries it was carried on without opposition and without censure. A jurist could not say that a practice thus supported was illegal,” and criminal.
If, in regard to the slave trade, which was prohibited by a law of Congress, and declared piracy on the part of a subject of our own country, the courts of the United States were required to regard the laws of other countries which had not prohibited it, and to recognize and protect the rights of the subjects of such other countries arising out of the slave trade, upon what legal principle can *727 727] a state of *the American Union set at naught the law of comity between states, and refuse to recognize or enforce legal rights, because they have their origin, not in the slave trade abroad, which has been condemned by a law of Congress and made criminal in a citizen of the United States, but in the relation of master and slave within the territory and under the laws of a sister state. Moralists and philanthropists may be indulged in their appeals to public sentiment in behalf of their schemes of moral reform; but courts of justice have no authority to change the legal 'standard of morality between states, and pronounce that to be immoral and criminal in the laws of another state, which has existed in different forms in all ages of the world, which is tolerated by the law of nations, which existed to some extent in every state of our confederacy' at the time of the formation of the Union, and which is distinctly recognized by the constitution of the United States, which we are bound by our judicial oath to support. It is the duty of the judicial tribunals to declare the law as it is, not to change it. In our judicial action wo can recognize no higher law than the law of the land. And I may add, that if the time shall come when our judicial tribunals shall yield to the clamor of popular excitement, and announce a higher law than the constitution and statutes framed under it, they will proclaim anarchy and organize insurrection.
Note. — The chief justice directs it to be noted that he had copied, and directed to be appended to his opinion, in a note, the statement of the case, copy of the return to the writ of habeas corpus, and opinion of Lord Mansfield in full, both at the adjournment, and on the final decision, in the case of Sommersett, as reported in 20 Howell’s St. Trials; but that, after his doing so, Judge Swan concluded to embody the same matter, in full, in the body of his opinion. And that this accounts for the omission of the matter, in a note here, to which the chief justice refers on page 714, but which will be found in Judge Swan’s opinion in this ease, at page 657.